## TENNESSEE COTTON GROWERS ASS'N. v. C. C. HANSON.

Western Section. January 15, 1926.

No petition for Certiorari was filed.

1. **Notice.** **Notice of acceptance of application for membership in a co-operative association held sufficient.**

In an action to recover on an organization and marketing agreement signed by defendant wherein it was provided that said contract was not to be binding until a certain number of signers should be secured and defendant would then be notified, held that the mailing of a letter in manner prescribed in the organization agreement was sufficient notice.

2. **Corporations.** **Failure to adopt by-laws in time prescribed by law does not render acts of corporation illegal.**

In an action to recover on a cooperate marketing agreement signed by the defendant where the defense was that the corporation had not adopted by-laws in the time prescribed by law and the contract signed by the defendant was therefore not enforcible held that the failure of the corporation to adopt by-laws as provided by law did not render its acts illegal.

3. **Corporations.** **Failure to adopt by-laws as required by law will not cause a forfeiture of corporation charter.**

Sec. 10 of chapter 100, Acts of 1923, requiring a corporation to adopt by-laws within thirty days is not a mandatory provision and the failure to comply with the requirements will not furnish grounds for forfeiture and dissolution of the charter.

4. **Corporations.** **Language of statute must be strong and unmistakeable to authorize court to forfeit charter.**

In statutes which make specific provisions for forfeiture of the charter where conditions subsequent to the granting of the charter are not complied with by the corporation, the general rule is that the language of the forfeiture clause of such a charter must be strong and unmistakable to authorize the court to hold that it was the intention of the Legislature to dispense with judicial proceedings.

5. **Corporations.** **The legality of the corporation cannot be attacked collaterally by a member.**

The legality of the corporation and its legal right to operate and function under its charter, cannot be collaterally attacked by a member, because of an act or omission on the part of the corporation. Until the corporation has been dissolved in a proper proceedings for that purpose it retains its legal entity and its corporate rights to operate and to conduct the business and to serve the purposes for which it was organized.

6. **Contracts.** **The organization agreement and marketing agreement of co-operative marketing association are valid contracts.**

The organization agreement and marketing agreement of the Tennessee Cotton Growers Association organized under chapter 100 of the Acts of 1923, known as the Cooperative Marketing Acts held valid and binding contracts and enforcible by the corporation.

7. **Injunction.** **Injunction properly granted to restrain one from disposing of his crops in violation of the contract with cooperative marketing association.**

In an action by cooperative association to enforce a marketing contract with one of its member, held that it is necessary to such association that its

members comply with their contracts and deliver their products to the organization and that the organization is entitled to specific performence of its contracts and an injunction was properly granted to restrain the defendant from marketing his crops elsewhere.

**8. Contracts. Specific performance. Specific performance of a contract is matter of judicial discretion.**

The general rule is that 'specific performance is a matter of sound judicial discretion and in the exercise of judicial discretion the court will take into consideration all the facts and circumstances as well as the nature and character of the transaction, and if it appear that the ends of justice and equity will be best served by requiring specific performance of the contract, the court, exercising its discretoin should decree a specific performance of the contract.

Appeal from Chancery Court, Shelby County; Hon. D. W. De-Haven, Chancellor.

Affirmed.

Carey & Vorderbruegge, of Memphis, for appellant.

Abe Waldauer & R. G. Brown, of Memphis, for appellee.

SENTER, J. Appellant, Tennessee Cotton Growers Association, a non-profit bearing corporation, organized under chapter 100 of the Acts of 1923, known as the Co-operative Marketing Act, filed its original bill in this cause against C. C. Hanson, an alleged member of complainant association, to recover from the defendant for the alleged breach of the contract, in the form of the "organization agreement and the marketing agreement" signed by the defendant. The bill also seeks an injunction, enjoining and restraining the defendant from selling and disposing of cotton grown by the defendant or his tenants for the years 1924, 1925, 1926 and 1927.

The material allegations in the bill important to be noticed at this time are as follows. In order to form a co-operative marketing association in Tennessee, and to remedy certain evils existing in marketing conditions, the organizers of defendant corporation formed an organization committee; this organization committee, as a preliminary step to the organization of the association, prepared and had circulated printed forms for the signatures of members, and organization and marketing agreement; that on contemplation of the proposed incorporation of the organization, the defendant C. C. Hanson, together with numerous other persons, signed, executed and delivered to the organization committee the association agreement; by said agreement so signed by defendant, and other growers of cotton, they, among other things  applied for membership in the proposed association; that the organizers of said organization, and the organization committee, after procuring the requisite number of signers prior to April 15, 1923, the date fixed in the organization agreement, proceeded to apply

for a charter of incorporation under chapter 100 of the Public Acts of 1923, known as the "Co-operative Marketing Act."

The bill further alleges that after the organization had been perfected, and a charter duly granted, notices were sent by mail to all the signers of the organization agreement, including the defendant; that defendant was duly notified by mail that his application for membership in the association had been duly accepted and that he had been elected a member of the association, in accordance with, and pursuant to the agreement previously signed by him.

It is further alleged that the defendant breached his contract and agreement with the association by failing and refusing to deliver the cotton grown by him, or by his tenants for the year 1923, and that he failed and refused to deliver to the association cotton grown by him or his tenants for the year 1923. The bill further alleged that complainant was entitled to recover from the defendant on account of the breach of the contract this sum stipulated in the contract as liquidated damages, which was 5c per llb. for the cotton grown for the year 1923, together with the fees, expenses, etc. as provided in the marketing agreement and organization agreement signed by the defendant. The bill also alleged that complainant is entitled to writs of injunction, enjoining and restraining the defendant from selling or marketing his cotton grown for the years covered by the contract, other than through the association.

The defendant demurred to the original bill setting up four grounds for demurrer. The demurrer was overruled by the Chancellor, whereupon the defendant answered the bill. The answer admits that complainant applied for a charter under the provisions of chapter 100 of the Acts of 1923. It admits that many cotton growers undertook to form the association for the co-operative marketing of the cotton of the grower members. It admits that the defendant signed the "Organization Agreement" and the "Marketing Agreement" filed as Exhibit "A" to the bill.

The defendant denies that the complainant is entitled to the relief sought in the bill. He denies that he has violated any agreement made by him; and denies that he is bound by the signed agreement, Exhibit "A" to the bill. He denies that the corporation was formed in the way and manner as represented to him it would be formed.

At the hearing of the cause the Chancellor sustained the bill and decreed a judgment against the defendant for the amount of penalty provided in the contract, which was 5c per llb. on the cotton raised by the defendant for the year 1923, also certain costs

and attorneys fees. The decree of the Chancellor made permanent the temporary writ of injunction.

From the decree of the Chancellor the defendant has appealed to this court, and has assigned numerous errors.

The first, second, third and sixth assignments of error present the question that the court erred in holding that the defendant breached his contract, because, complainant was never organized as a corporation, never had any legal existence, was never a legal entity, and because it was one of the terms and conditions of the contract that complainant corporation should be legally organized and should become a legal corporation and a legal entity, and that the defendant was never notified that his application for membership was accepted, and that the corporation did not have power to make the contract sued on only in the event it was authorized to do so by its by-laws and that no by-laws had been properly adopted.

The fourth assignment of error is directed to the action of the court in granting a temporary injunction and in making the temporary injunction perpetual. The fifth assignment of error complains of the action of the court in holding that the complainant is entitled to have specific performance of the contract by the defendant.

The facts disclosed by the record may be briefly summarized as follows. A group of individuals, composing an Organization Committee in March, 1923, before applying for a charter of incorporation, began taking the preliminary steps looking to the organization of a Co-operative Marketing Association to be composed of cotton growers. To this end it appears that these individuals had prepared a standard form of ''organization agreement'' and a standard form of ''marketing agreement,'' and circulated these forms among cotton growers, with the view of getting a sufficient number of subscribers of signers to the organization agreement and the marketing agreement to justify an organization to be incorporated under the general Co-operative Marketing Act.

It was one of the stipulations or conditions, that unless as many growers who in the aggregate had grown and marketed as much as 60,000 bales of cotton for the year 1922 signed the organization agreement; by April 15, 1923, that the signers would not be bound or obligated by their agreement to become members of the association, but in the event signers to the number who had for the year 1922 marketed in the aggregate 60,000 bales of cotton did sign the organization agreement and the marketing agreement, to become members of the proposed organization by April 15, 1923, the signers would be bound.

The defendant signed the organization agreement and the marketing agreement on March 8, 1923. These agreements were on

printed forms, and contained in the record as Exhibit "A" to the original bill, and is in substantially the same words and form, as "organization agreements" and "marketing agreements" used by other co-operative marketing associations in the several states that have enacted the same or similar acts authorizing the organization of corporations of this character.

On June 4, 1923, an application was made and granted for a charter of incorporation, designated in the charter as the Tennessee Cotton Growers Association. On that date all signers of the organization agreement and the marketing agreement were notified by the Secretary that growers representing more than 60,000 bales of cotton had signed the agreements.

The defendant, C. C. Hanson, was notified in the way and manner provided in the organization agreement that his application for membership had been accepted and that he had been duly elected a member of the organization. It appears from the record that this notice was duly mailed to the defendant to his address, postage prepaid. It is contended by the defendant that he did not receive this notice, and did not receive any other notice or notices of the completion of the proposed organization or that he had been elected to membership, or that he was a member of the organization. It appears that Mr. Gus Hill, the Field Service Director for the complainant, called on the defendant in person, and that the defendant, on the occasion of his first visit to him, promised to turn into the association all of the cotton legally bound to be delivered by him and grown by him in 1923.

This witness further stated that the defendant did not deliver the cotton grown in 1923, and after waiting some time he again went to see the defendant in March, 1924, and in a conversation with him at that time the defendant told him that at the time he signed the agreement he intended to deliver the cotton, but then admitted that he had not delivered the cotton and that he did not intend to do so, and also refused to pay the stipulated 5c per llb. as liquidated damages on the cotton that he failed to deliver.

Mr. R. S. Fletcher, the Secretary of the association, stated that immediately upon the completion of the organization, with subscribers numbering 5,300, totaling 63,478 bales for the previous year, secured prior to April 15, 1923, he proceeded to notify all the parties who had signed organization agreements and marketing agreements; that it was immediately announced through the public press that a sufficient number of signatures had been received. He then states that he notified each of the members of the acceptance of the contract after the organization had been effected, that is, each signer to an organization agreement and a marketing agreement.

He states that these notices were mailed to the defendant at the Post Office address given by him in his application for membership, and that his Post Office address was in the Union & Planters Bank Building. It also appears that it was a part of the plan devised by the Organization Committee that the signers of the marketing agreement and the organization agreement also became members of the Farm Bureau of Tennessee, and paid an admission fee of $10, part of which went to pay their dues to the Farm Bureau.

It also appears that the Farm Bureau and the Tennessee Cotton Growers Association jointly issued a semi-monthly paper, giving full publicity of all matters pertaining to the association, and that the defendant's name was on the mailing list of this Farm Bureau paper.

While the defendant denies that he received any of the notices referred to, yet we think it clear from the record that these notices were duly mailed to the defendant in the way and manner that the organization agreement and marketing agreement, signed by the defendant, provided. They were mailed in the usual way and to the address stated in the signed agreement of the defendant, and that the defendant therefore had constructive, if not actual, notice.

It is also clear from the record that certain newspaper publicity was given to the organization and activities of the association through the press in Memphis, and it is inconceivable that the defendant, a business man with offices in Memphis and with farming operations and engaged in growing cotton, did not have actual notice that the association was operating and functioning from the time of its organization in 1923, and subsequent to that time.

The record discloses that more or less newspaper publicity was given to the operations and activities of this association, and in addition to the items regularly published in the Farm Bureau's semi-monthly publication, and that this publication was regularly mailed to the defendant. It is probably true that the defendant became indifferent to the organization and its future after signing the organization agreement and the marketing agreement, and it is also probably true that he paid but little attention to its progress, but this did not release him from his contractual obligation, if he was otherwise bound by the organization and marketing agreement which he had signed. He certainly knew that he had made application for membership in the organization, and he knew that he had signed the organization agreement as well as the marketing agreement, and certainly must have known that the organization had been perfected and was functioning, whether he knew the details of its operations or not.

The main contention made by the assignments of error for the defendant is with reference to the manner of the organization of

this corporation, and the adoption of by-laws by the Organization Committee before the organization became incorporated. It is insisted that the corporation had failed to comply with certain statutory provisions with reference to the adoption of by-laws for the government of the corporation; that the Act under which this association was organized and incorporated provides that the corporation must adopt by-laws within thirty days after its incorporation, and that the corporation had never adopted any by-laws for its government; that the by-laws under which the corporation purported to operate were framed and adopted by the organization committee prior to the granting of the charter and that the corporation had not at any time since its organization formally adopted by-laws.

It is further contended for the defendant that the provisions of the Act with reference to the adoption of by-laws by the corporation within thirty days after its incorporation is a mandatory provision, and that the failure of the corporation to adopt by-laws as provided by the Act renders the acts of the corporation illegal.

It is further insisted by the defendant that the failure of the corporation to adopt by-laws as provided by the act renders the organization agreement signed by the defendant, and the marketing agreement signed by the defendant nugatory, and non-enforcible against the defendant. It appears from the record that since the organization and incorporation of the complainant Cotton Growers Association, it has all the time acted under the by-laws which appear to have been prepared and perhaps adopted prior to the actual granting of the charter.

It is clear from the record in this case that after the preliminary work preparatory to the formation of this association by the Organization Committee had been concluded, and a sufficient number of growers of cotton had signed the organization agreement to warrant the Organization Committee to proceed, the Organization Committee made proper application for a charter of incorporation, and that the organization was duly incorporated under the Laws of the State.

The Organization Agreement, among other provisions, conditions and stipulations, contained the following:

"We, the undersigned, in consideration of the premises and of our mutual undertakings and of the agreement of each and every party hereto, do agree as follows, each for himself and collectively for the express benefit of and as the Association to be organized:

"I. We will become members of the Tennessee Cotton Growers Association, a non-profit association, without capital stock to be organized under the laws of the State of Tennessee." . . .

"3. The affairs of the Association shall be controlled by a Board of eleven Directors; and the legal office of the Association shall be at Memphis, Tennessee."

"11. The Association shall confine itself to the problems and marketing of cotton and cotton products only and for its members only. It shall have Articles of Incorporation and by-laws prepared by the Incorporating Directors, stating the purposes and the powers of the Association; the rights and duties of the members; manner of forfeiture of membership; value of property interest on with-drawal; and any other necessary pertinent and important points of organization as determined by the organization Committee or the Board of Directors."

"12. The Association shall be organized by an Organization Committee, which shall take such steps as it may deem advisable to secure subscribers for this agreement and members of the Association. The Organization Committee may increase its membership from time to time and act in whatever way it may deem advisable. . . ."

"13. (a) If by April 15, 1923, signatures of cotton growers or persons eligible to membership who produced at least 60,000 bales of cotton of the 1922 crop shall not have been secured for this agreement, the Organization Committee shall so notify every subscriber at his address noted below, prior to May 1, 1923, and cancel his signature and the agreement signed by him.

"(b) If signatures of the growers of 60,000 bales shall be secured by the said date, April 15, 1923, then this agreement shall be binding upon all of the subscribers in all of its terms and there shall be no right of withdrawal whatsoever. . . ."

"15. We do hereby authorize the organization committee, as a representative of all the subscribers, to take such steps as it may deem proper to secure subscribers hereto; and when the adequate number is secured, to name a temporary public director; to hold primary elections and have the signers select organizing directors, conforming as closely as possible to the provisions Paragraph Four; and to take all steps necessary and advisable to organize the Association. . . ."

"16. (c) The Association shall send a written notice to every member in that district, notifying the members of the intention to organize such a corporation, specifying the amount of capital stock involved; nature of plant; location of plants; and specific purposes.

"The members shall have two weeks within which to signify their dissent or disapproval of such plan. If, within two

weeks of the mailing of such by the Association, the majority fail to file written notices of such disapproval or dissent, the Association shall proceed with its program and shall organize the corporation as indicated."

"17.  (a)  The subscriber agrees to be bound by the terms of the following market agreement.

"For such purposes signature to this association contract shall be deemed to all effects the same as signature to the said Marketing Agreement and as acceptance of each and every provision thereof and herein, as of the date of the mailing of notice of incorporation.  Notice thereof shall be mailed to each subscriber at his address as noted below.

" (b)  The subscriber here applies for membership in the Association when organized and expressly agrees that his signature to the Association Contract and to the Market Agreement herewith embodied and to this application for membership, shall be irrevocable, except as provided in paragraph 13; and that he so agrees, in order to induce other growers to sign this agreement for his benefit as well as their own general benefit and the public welfare.

" (c)  Acceptance of this application for membership and of the Marketing Agreement shall be deemed conclusive, upon the mailing of the notice by the Association; and such mailing and notice shall be conclusively established by the affidavit by the Secretary of the Association."

The Marketing Agreement among other provisions contains the following:

"2.  The Association agrees to buy and the grower agrees to sell and deliver to the Association all of the cotton produced or acquired by him or for him during the years 1923, 1924, 1925, 1926 and 1927."

The Marketing Agreement under Item 13 (a) provides further:

"This agreement shall be binding upon the grower as long as he produces cotton directly or indirectly, or has the legal right to exercise control of any commercial cotton or any interest thereon during the term of this contract."

Item 18 provides as follows:

"18.  (a)  In as much as the remedy at law would be inadequate; and in as much as it is now and ever will be impracticable and extremely difficult and determine the actual damage resulting to the association, should the grower fail to sell and deliver all of his cotton, the grower hereby agrees to pay to the Association for all cotton delivered, sold, consigned, withheld or marketed by or for him, other than in accordance with the terms hereof, the sum of 5c per llb. mid-

dling basis, as liquidated damages for the breach of this contract; all parties agreeing that this contract is one of a series dependent for its true value upon the adherence of each and all the growers to each and all of the said contract.

"(b)   The grower agrees that in the event of a breach or threatened breach by him of any provision regarding delivery of cotton, the association shall be entitled to an injunction, to prevent breach or further breach hereof and to a decree for specific performance hereof; and the parties agree that this is a contract for the purchase and sale of personal property under special circumstances and conditions and that the buyer cannot go to the open markets and buy cotton to replace any which the grower may fail to deliver.

"(c)   If the Association brings any action whatsoever by reason of the breach or threatened breach hereof, the grower agrees to pay the Association all costs of Court, costs for bonds, and otherwise, expenses of travel and all expenses arising out of or caused by the litigation and any reasonable attorney's fee expended or incurred by it in such proceedings, and all such costs and expenses shall be included in the judgment and shall be entitled to the benefits of any lien securing any payment thereunder,"

It is not denied by the defendant that he signed the Organization Agreement and the Marketing Agreement, Exhibit "A" to the bill, portions and items of which are above quoted. The contention made by the defendant to the effect because of the failure of the corporation to formally adopt by-laws within thirty days after its incorporation, we do not think can avail the defendant under the law and the facts of this case. It is admitted that the organizers of this Association made proper application for and obtained a charter of incorporaton under the provisions of chapter 100 of the Public Acts of 1923, and under the general incorporation laws of the State. The application for the charter was signed by more than five persons as provided by section 2025, Shannon's Code. The instrument was duly probated as required by section 2026 of Shannon's Code; the application, probates and certificates were duly registered in the county (Shelby) where the principal office of the company is located, and registered in the office of the Secretary of State as required by law. It is provided by section 2026, Shannon's Code that upon the proper registration of the instrument, and a certificate of registration given by the Secretary of State, under the great seal of the State, shall when registered in the Register's Office of said county, with the facsimile of the said seal, completes the formation of the company as a body politic;

"and the validity of the same in any legal proceeding shall not be collaterally questioned."

It is not denied in this case that complainant was duly incorporated, and its charter granted by the State of Tennessee duly registered. So far as the record discloses all matters and things necessary to complete the incorporation of complainant were fully and properly complied with.

But it is contended for the defendant that the Act, chapter 100 of the Public Acts of 1923, made specific provision for the adoption of by-laws by the corporation; this provision of the Act is found in section 10. "That each association incorporated under this Act, must, within thirty (30) days after its incorporation, adopt for its government and management, a code of by-laws, not inconsistent with the powers granted by this Act. A majority vote of the members or stockholders, or their written assent, is necessary to adopt such by-laws." The same section then sets out the matters that may be provided by the by-laws of the corporation.

Upon the completion of incorporations, and the granting of the charter, and a compliance with the statutory requirements, the corporation became complete, and a corporate entity, and authorized and empowered to transact the business and to do the things within its charter rights.

If it be true that the corporation did not formerly comply with section 10 of the Act under which it was incorporated, with reference to the adoption of by-laws, it would not operate of itself to render the contracts of the corporation invalid and non-enforcible.

In the case of Dark Tobacco Growers Co-op. Association v. Mason, 150 Tenn., 228, among other contentions made in that case was that the contract in question was signed by the defendant, and was formally accepted by complainant as a corporation at a date prior to the date on which the association (a Kentucky corporation) had filed an abstract of its charter with the Secretary of State in Tennessee, and that the contract was, for that reason, illegal and non-enforcible against the defendant. The contract in that case, consisted of "An Organization Agreement and a Marketing Agreement" in practically the identical language and with the same stipulations and conditions and provisions, as the "Organization Agreement and Marketing Agreement" in the instant case. Mr. Justice Hall, who wrote the opinion in that case, on that subject, stated as follows: "The contract is divided into two parts. The first part of the contract is an association agreement. By its terms the various growers signing the same agreed to form complainant association. This portion of the contract became effective and binding as soon as it was signed by the grower. The second portion, or the Marketing Agreement, merely tendered a contract to the corporation when organized. . . ."

The opinion in that case sets out all the provisions under Item 17, and the several sub-sections to Item 17 of the contract, the marketing agreement and organization agreement, which section 17 of the Marketing Agreement is in the exact language of the marketing agreement signed by the defendant in this case, and in commenting upon said Item in said contract, it is stated:

"The notice of acceptance referred to in the last above quoted paragraph of the contract, as found by the jury, was mailed to the defendant on November 28 or 29, 1922, three or four days after complainant had filed its charter in Tennessee which was on November 25, 1922.

"Complainant and defendant had agreed that the contract should be treated as accepted by complainant as of the date of mailing such notice, and the fact of acceptance by the association deemed conclusive upon the mailing of the notice, it must be held that the contract became effective on the date that the notice was mailed to the defendant, and not before."

While it is contended by the defendant in this case that the failure of the complainant to adopt by-laws for the government of the corporation within thirty days after the charter was granted renders the corporation and its acts illegal, and this is the principal reliance of the defendant in support of his contention that he is not liable under his contract, it can not be sustained on any legal authority.

If it be true that the corporation has been guilty of a failure to comply with the provision with reference to adopting by-laws, and if it be conceded that the provision in the Act is a mandatory provision requiring the complainant to adopt by-laws within the thirty days after its incorporation, this, at most, would constitute a cause of forfeiture of the charter in a proper proceedings brought for that purpose. 7 R. C. L., sec. 721.

However, we do not construe the word "must" as used in section 10 of the Act with reference to the adoption of by-laws as a mandatory provision or requirement, in the sense that a failure of the corporation to formally comply with the provisions would furnish grounds for a forfeiture and dissolution of the charter. If the corporation was legally formed and given corporate existence by the granting of the charter by the State, the State through its proper agencies and in a proper proceedings in a court of competent jurisdiction could have the charter declared forfeited and the corporation dissolved for material violation of charter provisions. 14 C. J., 3679.

The provision of the Act with reference to the adoption of by-laws, and employing the word "must," does not provide any penalty for the failure of the corporation to comply with the pro-

vision; it does not declare a failure to comply with the provision a ground of forfeiture; nor does it provide that a failure to adopt the by-laws, "shall work a forfeiture" of the charter granted under the Act. Even in statutes which make specific provision for forfeitures of the charter where conditions subsequent to the granting of the charter are not complied with by the corporation, the general rule is that the language of the forfeiture clause of such a character must be strong and unmistakable to authorize the court to hold that it was the intention of the Legislature to dispense with judicial proceedings. 14 C. J., 1092.

However, the legality of the corporation, and its legal right to operate and function under its charter, cannot be collaterally attacked by a member, because of any act of ommission on the part of the corporation. Until the corporation has been dissolved in a proper proceedings for that purpose it retains its legal entity and its corporate rights to operate and to conduct the business and to serve the purposes for which it was organized. 17 R. C. L., sec. 731; 96 Tenn., 252.

The defendant has not been in way prejudiced or injured by the failure of the corporation to formally adopt by-laws after it was incorporated. The by-laws, which seem to have been prepared by the Organization Committee and the Directors have been recognized and used by the corporation since its organization; the by-laws are clearly within the provisions of the act, and not inconsistent with the act. The by-laws under which the corporation has acted and operated are not inconsistent with any item or provision of the "Organization Agreement" and "Marketing Agreement" signed by the defendant. In this suit by the complainant against the defendant the cause of action is not predicated upon the by-laws, but is predicated solely upon the contract between complainant and the defendant.

A majority of the states have enacted Co-operative Marketing Acts authorizing the formation and incorporation of growers of farm commodities intended to improve marketing conditions, and to afford producers of various farm products better facilities to profitably and economically market the products of the soil. There is great similarity in these enactments. There is also great similarity in the general organization scheme and organization agreements and marketng agreements authorized by the Acts of the several states which have made statutory provision for such organizations and associations. The wisdom and the fairness as well as the importance of this character of legislation has been generally approved and commended by the courts. Enactments of this character by the various states have been uniformly upheld. The organization agreements and marketing agreements of numerous

co-operative associations have been frequently before the courts, and have been frequently contested by individual members, but in every single instance, so far as we have been able to ascertain from an examination of the reported cases, these organization agreements and marketing agreements have been sustained.

We concur in the conclusion reached by the Chancellor to the effect that the defendant is legally obligated and bound by his contract with the complainant, and that he is liable to the complainant for the breach of the contract.

The remaining two assignments of error are directed toward the action of the court in making perpetual the temporary writ of injunction granted in the cause; and in decreeing specific performance of the contract for the remaining years of the contract period after the year 1923.

"Specific performance is an equitable remedy, which compels such substantial performance of the contract as will do justice between the parties." Sugar v. Froehlich, 229 Ill. 397; 14 Words and Phrases, pp. 654.

"Specific performance of the contract is a purely equitable remedy, being the substitute for the legal remedy of compensation when it is inadequate or impracticable, and lies within sound judicial discretion on consideration of the particular surrounding circumstances." Brown & Sons v. Boston & M. R. R., 76 Atl., 692.

"Specific performance contemplates that the party against whom such relief is sought, has by his contract and covenant, agreed to do some certain specific thing which the court can order." Moray v. Terre Haute Traction, etc., Co., 47 Ind. App., 16.

"Applications for specific performance of contracts will enforced or denied as the justice and equity of the case may require." McClure v. Harris, 7 Heisk., 379.

"The specific performance of contracts, is not a matter of absolute right in either party but is a matter of sound discretion in the court, to exercise according to what, under all the circumstances of the case, may appear to be reasonable and proper." Humbard v. Humbard, 3 Head., 100; Howard v. Moore, 4 Sneed., 317; Otis v. Paine, 86 Tenn., 663.

The general rule is that specific performance is a matter of sound judicial discretion and in the exercise of judicial discretion the court will take into consideration all the facts and circumstances, as well as the nature and character of the transaction, and if it appear that the ends of justice and equity will be best served by requiring specific performance of the contract, the court, exercis-

ing its discretion, should decree a specific performance of the contract. L. R. A. (N.S.), 332.

Applying this general rule to the facts, circumstances and nature of the transaction involved in this case, we think the decree of the Chancellor well warranted. Unless the complainant can require its member growers of cotton to make actual delivery of the cotton as provided in the contract, the organization could not accomplish the results for which it is organized. The important element or factor entering into the successful carrying out of the purposes of the association, is that it may have the marketing control of all cotton grown by its members. If the members of the association are permitted to disregard the contractual obligation to make actual delivery of the cotton, and the association denied the right to enforce specific performance of the contract, and forced to rely solely upon its remedy to recover the amount of liquidated damages fixed in the contract, then the very purposes of the organization, that of co-operative marketing, is defeated. It is necessary and essential, if the members of the association are to receive the protection and the benefits of such an organization, that the grower members shall make actual deliveries of cotton as contemplated and provided by the marketing agreement. We think the complainant is entitled to have the defendant deliver his cotton to the complainant as he contracted to do, and to the end that the complainant can serve the purposes for which it is organized, viz, market the cotton for its growers under the co-operative marketing plan.

We are also of the opinion that there was no error in the action of the Chancellor in granting and making perpetual the injunction in this cause restraining and enjoining the defendant from marketing his cotton during the life of the contract outside of the association. The enforcement of specific performance of a contract by injunction for the threatened breach of the contract, or from continuing a breach of the contract, is the usual and proper remedy and method of enforcing specific performance of contracts. 3 Williston on Contracts, sec. 1445.

It results that all assignments of error are overruled, and the decree of the Chancellor is affirmed. The defendant and his surety on the appeal bond will pay the cost of this appeal. The cause is remanded for the carrying out of the decree of the Chancellor.

Owen and Heiskell, JJ., concur.