## H. P. DAWKINS v. FRED KOCH.

Western Section. April 3, 1930.

W. C. Rodgers, of Memphis, for appellant.
Metcalf, Metcalf & Apperson, of Memphis, for appellee.

SENTER, J.   The original bill was filed in this cause to compel specific performance of a contract alleged to have been entered into between the complainant and the defendant on May 2, 1928, for the conveyance of a tract of land owned by the defendant, consisting of 204½ acres situated near the corporate limits of the City of Memphis, in Shelby county.   The bill alleged that the contract had been entered into between the complainant and the defendant and by the terms of which the defendant contracted and agreed to sell and convey to the complainant the tract of land for the consideration of $70,000, upon the terms of $1,000 cash, and sixty-nine notes each for the sum of $1,000, payable annually; the first ten of said notes for the sum of $1,000 each, to bear interest only from maturity, and the remainder of the notes to bear interest beginning ten years from their date.

We deem it unnecessary to set out in detail the allegations contained in the bill.

The defendant filed an answer, and in which he denied that the complainant had been willing to carry out the contract according to its terms, claiming that the complainant had contracted to purchase the property according to the "Humphrey Survey," and that he demanded and exacted of defendant a deed after a survey had been made showing a reduction in the acreage of some six acres, thereby reducing the purchase price on account of the alleged shortage in acreage by about the sum of $2,000, and that complainant had not expressed a willingness to accept the deed unless said alleged shortage was deducted and the purchase price reduced on the basis of the agreed price for the tract containing the 204½ acres, and that the defendant had accepted the breach of the contract by the complainant. The answer further alleged that the contract of May 2, 1928, does not correctly represent and express the actual agreement entered into by the parties in several particulars.   First, that in addition to the consideration recited in the contract, complainant agreed to pay the de-

linquent taxes assessed against the property with interest and penalties thereon, in an amount not to exceed the sum of $6,000; and would also pay the taxes for the year 1928. Second, in consideration of the waiver of the payment of interest on the deferred payments for ten years, the complainant would execute five additional notes of $1,000 each, payable at the end of the sixth, seventh, eighth, ninth and tenth years, and third, that the interest on the deferred payments of the purchase money would be payable annually.

The contract sued on also contained a provision by which the complainant, at any time within the first ten years, could cancel or revoke the contract.

After the filing of the answer the complainant was permitted to amend the original bill so as to waive the provision in the contract whereby complainant could revoke the contract at any time within ten years.

The defendant was also permitted to file an amendment to his answer, and to treat the original and amended answers as a cross-bill praying for a rescission or reformation of the contract sought to be enforced. In the amended answer and cross-bill it was alleged that on April 9, 1928, there had been prepared a previous contract to the contract of May 2, 1928, and that in all the negotiations the complainant, had agreed that the interest on the deferred payments should be payable annually instead of after maturity of the several notes, and had agreed to execute five additional notes of $1,000 each payable at six, seven, eight, nine and ten years after date, and contained other provisions that the parties had agreed upon after several conferences, and further alleging that the contract of May 2, 1928, was intended to embrace the provisions of the contract of April 9, and that the contract of May 2, 1928, was intended by the parties to simply modify certain of the provisions of the terms of the proposed contract of April 9. It is also alleged in the answer and cross-bill, as amended, that the defendant had no income from other sources; that he was past seventy-five years of age, in poor health, and not informed on business matters; that he had a wife and two daughters, one of whom was an afflicted invalid, and for whose welfare he was especially solicitous, and that it was necessary that in selling the property the interest on the deferred payments would be paid annually so as to provide a support for himself and his dependents after his death; that he understood that the contract of May 2, 1928, made provision for the payment of interest annually, as had previously been agreed upon in the previous negotiations, and which had been specifically agreed upon in the previous contract of April 9; that he relied upon the representations of the real estate agent, who was the agent of complainant in negotiating the purchase that these provisions were taken care of by the contract; that in the contract of April 9, which

had been prepared by complainant on a printed form, the provision that interest would be payable annually was interlined and agreed to by the complainant; and that in a letter of April 24, the complainant had agreed to execute the five additional notes of $1,000 each in consideration of the waiver of interest on the purchase money for the first ten years, and that the contract of May 2 was intended to include these matters which had been agreed upon in their prior negotiations; that defendant signed the contract of May 2 in the belief and with the understanding that it did so provide; that the agent of complainant, Parnell, rushed the defendant into the signing of the contract during the absence of his attorney, Mr. Metcalf, from the City of Memphis, and while Mr. Metcalf was in New York on business.

It appears that all the negotiations between the parties were conducted by Parnell, a real estate salesman in the employ or offices of J. B. Saunders & Co., real estate agents in Memphis. The negotiations began in January, 1928, when Parnell approached Koch with a proposal to purchase the property, for the price of $70,000 cash. These negotiations resulted in Parnell signing a contract to purchase the property at the price of $70,000 cash. It appears that Parnell was desirous of making the purchase for a Mr. Johnson, who desired to purchase the property as an investment. The purchase was not consummated by Parnell, and the Mr. Johnson fades out of the picture. Mr. Parnell claims to have been referred by Johnson to Mr. Solomon, who was then the manager of the Bry-Block Mercantile Co., as one who would probably be interested in purchasing the property for an aviation field, and that Mr. Solomon in turn referred him to Mr. Dawkins. It seems that Mr. Dawkins informed Parnell that he would only be willing to purchase the property, except on long terms in annual installments extending seventy years, and upon this he began the negotiations between Dawkins and Koch, which ultimately terminated in the signing of the contract of May 2, 1928. It also appears that Koch was willing to sell the property on the terms of annual payments covering a period of seventy years, and the annually maturing notes for that period to bear five per cent interest so as to provide an annual income sufficient to support him and his dependents during his lifetime and to provide a support for his dependents after his death, and that he was agreeable to this arrangement since he would have to make some investment of the money if the property were sold for cash.

After negotiations began three different contracts were submitted to Koch prior to the contract of May 2. The first proposed contract was March 17, 1928, and this contract did not meet the approval of Koch; another contract dated March 24 was prepared and submitted to Koch and this contract was not satisfactory to him and did not meet the approval of his attorney. Then the contract of April 9 was

submitted, and after making certain changes or alterations, and so as to provide that the interest would be payable annually rather than at the maturity of the respective notes, it was acceptable to Koch and he signed it, but it was apparently not signed by Dawkins. A question with reference to the delinquent taxes arose in the meantime. Koch had been of the impression, and had so represented, that the taxes on the property had been paid to the year 1922, and that it was later discovered that the taxes had not been paid for the three years prior thereto. Koch did understand that the delinquent taxes and penalties amounted to $6,000 in the aggregate, and it appears that this was the aggregate amount of the delinquent taxes, but the $6,000 covered the delinquent taxes for the years from 1918 to 1927, in place of from 1923 to 1927. When this was discovered it was arranged between the parties that Dawkins would pay the delinquent taxes and that Koch would waive interest for the first ten years upon the execution of the five additional notes referred to. While Mr. Metcalf, the personal counsellor and attorney for Koch, was in New York on other business, this matter of the delinquent taxes and the new arrangement for taking care of the same developed, and when it became necessary to alter the contract so as to take care of the delinquent taxes, Mr. Koch called at the offices of his attorney, Mr. Metcalf, for further advice, and finding Mr. Metcalf out of the city and in New York, he consulted with Mr. Apperson, one of the law partners associated with Mr. Metcalf. It is clear from the record that Mr. Apperson was not familiar with the negotiations that had preceded, and especially with reference to the interest to be payable annually, and such advice as he gave to Mr. Koch was in the main with reference to the delinquent tax arrangement, rather than the other details of the contract, he evidently assuming that the other features of the contract had been approved by Mr. Metcalf, as the attorney for Mr. Koch. It is also apparent from the record that when Mr. Parnell presented the contract of May 2, 1928, to Koch he delivered an ultimatum to the effect that Dawkins was submitting this contract and that if it was not accepted the negotiations would be terminated. It is also apparent that Parnell represented to Koch that the letter written by Dawkins of April 24, with reference to the additional notes, would be complied with, and we think it clear from the record that Koch understood that the notes would draw interest at the rate of five per cent, payable annually, and that the additional notes would be executed pursuant to the previous agreement.

The Chancellor found the facts as above stated, and upon which he based the decree by which he denied the relief sought by complainant and dismissed the bill. The Chancellor held that the prior negotiations between the parties, and especially with reference to the payment of the interest on the deferred payments annually, was to be

made a part of the contract for the sale of the property. He also held that under the facts the contract did not fairly represent and express the understanding which Koch had, and that there had not been a meeting of the minds of the parties. The Chancellor further held that even if the contract of May 2 expressed the agreement of the parties, that under all the facts and circumstances surrounding the transaction, considering the age and condition of defendant, Koch, and the evident desire to provide for himself and his dependents in making the sale, and without the interest payable annually on the deferred payments, his income would be insufficient to meet his living expenses and to care for his helpless and dependent family, and that in the circumstances to grant the relief of specific performance of the contract would be harsh and oppressive and inequitable. The Chancellor further held that upon another ground, the complainant would have to be denied the relief sought, for the reason he did not offer to comply with the contract according to its terms, in that the contract was for the purchase of the property according to the ''Humphrey survey'' which was attached to and made a part of this contract, and that the demand of complainant that an alleged shortage of six and three-tenths acres on the basis of 204½ acres at $70,000, would entitle a reduction of about $2100 from the consideration price mentioned in the contract.

We will not burden this opinion with a detailed discussion of all the evidence contained in the somewhat elaborate record, but after a careful review of all the evidence we concur in the facts as found by the Chancellor and as set forth in the written opinion filed by the Chancellor and contained in the record. We think the facts as found by the Chancellor are supported by a preponderance of the evidence, and also by the circumstances surrounding the transaction. We do not think that there was a meeting of the minds of the parties, and that the contract of May 2, 1928, and upon which complainant bases this suit for a specific performance of the contract, fairly expresses the understanding and intention of defendant Koch. All the negotiations preceding the signing of the contract of May 2 disclose the evident purpose which the defendant, Koch, had in agreeing to a sale of this property on terms and payments covering a period of seventy years, to be a desire upon his part to receive therefrom income sufficient to support and maintain him during his lifetime and his wife and children, and to make provision for his dependents after his death. We are further of the opinion that Parnell, in all the negotiations, was the agent of complainant, Dawkins. When he brought the contract of May 2, 1928, to Koch, which had already been signed by Dawkins, we think it clear that he represented to Koch that Dawkins would execute the notes and advance the money for the payment of the delinquent taxes from 1918 to 1923 in accordance with the agree-

ment contained in the letter of April 24, and that the interest would be payable annually. Koch relied upon these representations. He was no doubt anxious to close the transaction, and Parnell, in the absence of his personal attorney, Mr. Metcalf, urged Koch to sign the contract on the assurance that the notes would be executed, the five additional notes, and that the interest would be payable annually. It was by this persuasion on the part of Parnell that Koch was induced to sign the contract of May 2 now sought to be enforced by a specific performance. If the relief of specific performance should be granted to complainant, it would operate to deny this old man, now advanced in years, and with but little knowledge of legal terms, of an income sufficient to support himself and his dependents. It is clear that the notes could not be discounted or sold except at a heavy discount, if at all, maturing one note annually covering a period of seventy years, and each note carrying its own interest at maturity. To require the enforcement of this contract, we think would be inequitable and unfair and would operate as a harsh and oppressive rule to be imposed upon the defendant by requiring a specific performance. The matter of requiring specific performance of a contract is largely in the discretion of the court, and its enforcement by specific performance will be denied by a court of equity where its performance would operate as oppressive and burdensome to one of the parties, and give an unfair and inequitable advantage to the other.

In the well-considered case of Caldwell v. Ins. Co., 124 Tenn., 611, the court quotes with approval: the principle from 3 Pomeroy's Equity, section 1405, as follows:

"The remedy of specific performance is governed by the same rules which control the administration of other equitable remedies; the right to it depends upon elements, conditions, and incidents which equity regards as essential to its peculiar modes of relief . . . The contract must be perfectly fair, equal and just in its terms and in its circumstances."

In the case of Cotton Growers Ass'n v. Hanson, 2 Tenn. App., 118, this court said:

"The general rule is that specific performance of a contract is a matter of sound judicial discretion, and in the exercise of judicial discretion the court will take into consideration all the facts and circumstances as well as the nature and character of the transaction, and if it appear that the ends of justice and equity will be best served by requiring specific performance of the contract, the court, exercising its discretion should decree a specific performance of the contract."

In the cases of Hubbard v. Hubbard, 3 Head., 100; Howard v. Moore, 4 Sneed, 317; Otis v. Paine, 86 Tenn., 663, it is recognized that specific performance of contracts is not a matter of absolute

right in either party, but is a matter for the exercise of sound judicial discretion under all the circumstances of the case.

In Sugar v. Froehlich, 229 Ill., 397, it is said:

"Specific performance is an equitable remedy, which compels such substantial performance of the contract as will do justice between the parties."

In McClure v. Harris, 7 Heisk., 379, it is held that applications for specific performance of contracts will be enforced or denied as the justice and equity of the case may require.

Specific performance being an equitable remedy, it is the substitute for the legal remedy of compensation when the legal remedy is inadequate or impracticable, and, therefore, lies within the sound judicial discretion of the court upon a consideration of all the facts and circumstances surrounding the transaction. (Brown & Sons v. Boston & M. R. R., 76 Atl., 692, and cases cited.).

The first two assignments of error, or rather the subdivisions of the first assignment of error, challenge the correctness of the ruling of the court in admitting the depositions of John W. Apperson and W. P. Metcalf, and of Walter Fransioli, T. J. Turley, Henry Wetter, L. Y. Williamson, and H. H. Beall. The exceptions to the depositions of Apperson and Metcalf are based on irrelevancy and hearsay and immateriality. This evidence was with reference to the prior negotiations, it is not hearsay and does not come within the hearsay rule. Prior negotiations between the parties may be looked to for the purpose of determining the real intention and understanding of the parties and also as to whether there was a meeting of the minds of the parties and whether there was mutuality of understanding as to the meaning of the terms and provisions. The intention of the parties to the contract must control, and the prior negotiations leading up to the signing of the contract will be looked to in determining the question of intention. (6 R. C. L., p. 839, sec. 228; U. S. v. Bethlehem Steel Co., 51 U. S. (L. Ed.), 736-7; Simpson v. U. S., 50 U. S. (L. Ed.), 245). This was the effect of the evidence of both Apperson and Metcalf. The exceptions to the depositions of Fransioli, Turley, Wetter, Williamson, and Beall, is on the grounds that this evidence is immaterial. These witnesses testified to the value of the land in controversy. They fixed the value at from $400 to $500 per acre. The property was sold for about $350 per acre, and on the unusual terms of seventy annual payments of $1,000 each with interest at five per cent. This evidence was competent and material for a determination of the question of the fairness of the contract, especially where the contract did not provide for the payment of interest annually. The assignments of error based upon the admission of this evidence over the exceptions of complainant are accordingly overruled.

'The other assignments of error are directed to the finding of the facts as found by the Chancellor, and to the action of the court in denying the relief of specific performance, and in decreeing a dismissal of the bill. The conclusions we have reached as set forth herein disposes of these assignments adversely to the contention of appellant.

We are of the opinion that there was not a meeting of the minds on the contract of May 2, 1928, made the basis for the suit for specific performance. We are also of the opinion that under all the facts and circumstances as disclosed by the record in this case, that it does not present a case warranting a decree for specific performance. We are also of the opinion that the complainant, by demanding that the alleged shortage in acreage be deducted from the consideration price was not in accordance with the provisions of the contract, and that this demand operated as a breach of the contract upon the part of the complainant entitling the defendant to accept the breach and terminate the negotiations as held by the Chancellor.

It results that all assignments of error are overruled, and the decree of the Chancellor is affirmed. Appellant and surety on the appeal bond will pay the cost of this appeal.

Owen and Heiskell, JJ., concur.