SAMUEL W. McCALL & another, receivers, vs. NEW YORK
LIFE INSURANCE COMPANY.

ADVERTISER NEWSPAPER COMPANY vs. SAME.

SAME vs. SAME.

Suffolk.   December 7, 1908. — February 26, 1909.

Present: KNOWLTON, C. J., MORTON, HAMMOND, & SHELDON, JJ.

*Landlord and Tenant*, Eviction.

In an action for rent alleged to be due under a lease of the entire fourth floor of a
building on Washington Street in Boston to a life insurance company, to be
used for the transaction of life insurance business, it appeared that the lessor
covenanted that he would "at his own expense, cause the elevators in said
building to be kept in repair and to be operated daily during reasonable busi-
ness hours except on Sundays and legal holidays, and when the same may be
stopped by inevitable accident or for necessary repairs." At the trial the de-
fendant introduced evidence tending to show that the use of the elevator was
necessary to the lessee, that the elevator service was so imperfect as to make
the premises leased practically unfit for the transaction of the business for
which they were hired, that the power used to run the elevator also was
used to run two printing presses and the electric lights in the building, and that
the defective elevator service was due to abstraction of the power from the
elevator for the other uses, which abstraction was done wilfully, and notwith-
standing complaints by the lessee was persisted in by the lessor, and that, in
consequence of the condition of the elevator service, the lessee quit the prem-
ises, having paid all rent due at the time it left.   The defendant contended
that it was evicted by the acts of the lessor, but the presiding judge refused
to allow the jury to consider that defense, and ordered them to find for the
plaintiff, and the defendant excepted.   *Held*, that the exceptions must be sus-
tained, as the jury would have been warranted in finding that the defendant
was evicted.

A lessee, who has been evicted from the leased premises by acts of the landlord
which make it impossible for the tenant to use the premises as they were in-
tended to be used according to the lease, is not obliged to return even if the
cause of the eviction afterward is removed, and, if he does not return volun-
tarily, the landlord has no right to recover rent under the lease after the
eviction.

THREE ACTIONS OF CONTRACT for rent alleged to be due
under the same lease.   Writs dated respectively February 25,
1904, March 3 and June 5, 1905.

The cases were tried together before *Flaherty*, J.   The facts
are stated in the opinion.   There was no evidence introduced
by the defendant in regard to the state of things or the way

in which the elevator was operated after the defendant quit the premises.

At the close of the evidence, the presiding judge, upon the defendant's counsel stating that he made no claim in recoupment, ruled that the evidence was not sufficient to constitute an eviction of the tenant, and ordered verdicts for the plaintiffs. The defendant alleged exceptions, which, after the death of *Flaherty*, J., were allowed by *Gaskill*, J.

*W. A. Morse*, (*F. J. Geogan* with him,) for the defendant.

*C. F. Eldredge*, (*R. W. Nason* with him,) for the plaintiffs.

HAMMOND, J.   To these three actions for rent alleged to be due under a written lease to the defendant, the defense relied upon at the trial was eviction; and the main question is, whether upon the evidence the defendant was entitled to go to the jury on that defense.

At the trial many of the material facts were not in dispute. It appeared that the lease was dated July 1, 1902, and was for the term of five years from the first day of September, 1902. The demised premises consisted of the entire office space on the fourth floor of the Union Trust Company building, " with the privileges and appurtenances to the same belonging." The lessor covenanted *inter alia* that it would " at its own expense cause the elevators in said building to be kept in repair, and to be operated daily during reasonable business hours except on Sundays and legal holidays, and when the same may be stopped by inevitable accident or for necessary repairs." The defendant went into actual occupancy of the premises under the lease in October, 1902, and continued in occupation until June 30, 1903, on which day it vacated the premises, having first given notice of its intention to do so for the reason that the lessee was unable to enjoy and make use of the premises " on account of the irregular, defective, insufficient and dangerous working and ways of the elevator on said premises provided for tenants of the building." The rent was paid up to and including June 30, 1903, and these suits were for rent after that date. The lease provided that the leased premises should be used " only as and for the transaction of life insurance business, and for no other purpose whatsoever, without the written consent of the lessor, evidenced on this lease."

There was evidence that there were about twenty-five agents

of the defendant company having desk room on the premises, who frequently had occasion to use the elevator, as did also customers who came to see the company on business, and that there was an average of about one hundred and fifty persons who had occasion to make use of the elevator in going to and from the defendant company's premises in the regular course of business; that the customers "represented people of both sexes, a great many of whom were people well advanced in years, some of whom walked upstairs with great difficulty, and some of whom were unable to walk upstairs or walk down, to and from" the premises.

There was also evidence that from the first the working of the elevator was irregular and unsatisfactory, and that it continued to be so, up to the time the defendant vacated the premises. One witness testified that "the elevator did not run during business hours with any regularity, and that persons desiring to go to and from the offices of the defendant were compelled to walk up and down stairs; that the elevator would stop at all hours of the day, and would continue to be so stopped at different times, from fifteen minutes to one half day; that sometimes the elevator would not start from the lower floor . . .; sometimes when the elevator was at the top of . . . [the] building it would remain there stopped for an hour or two"; that "sometimes the elevator would stop between the landing-places and the floor below, so that passengers in the elevator were unable to get out at all, or . . . [only] . . . with great difficulty, . . . [or at] considerable personal danger." Another witness, who, as the employee of the lessor had had charge of the running of the elevator, testified "that he had been on the elevator when it stopped between the floors and could not move either way; that he had been operating . . . [it] . . . when it had stopped running for more than an hour at a time." Another elevator boy testified in similar language to the stopping of the elevator in business hours. Another boy who had run the elevator testified that it "would sometimes stop for three quarters of an hour between floors, sometimes with three or four people in it." It is unnecessary to rehearse further the testimony on this point. It is sufficient to say that the evidence justified a finding that the elevator service was so imperfect as to interfere very greatly

with the defendant's use and enjoyment of the premises, — indeed to such an extent as to make the premises practically unfit for the transaction of the business for which they were hired.

The evidence further tended to show that the power plant by which the elevator was run operated also a printing press which printed two newspapers, and also the electric lights in the building; that the stopping of the elevator was due to the appropriation, for the purposes of operating the printing press and the electric lights, of power needed to run the elevator properly, and that this appropriation was made by the lessor or by its authority, and was wilful and made with the knowledge of the consequences which would ensue to the elevator service. The evidence also tended to show that complaints of the action of the elevator were frequently made by the defendant to the lessor, that the lessor did not remedy the trouble, and that finally, through its manager, it declined to hear any more complaints or to do anything about it.

To state the matter briefly, the jury upon the undisputed facts and the evidence as to the facts in dispute properly might have found that by reason of the defective elevator service the premises were entirely unsuitable for the purpose for which they were hired and for which alone they could be used under the terms of the lease; that this defective service was due to the abstraction of power needed to run the elevator properly; that this abstraction was wilfully and actively made by the lessor or by its authority, and, notwithstanding the complaints made to the lessor, was persistently continued with knowledge of the consequences. The lessor must be held to have intended these consequences.

Such findings would have shown an eviction at the election of the lessee, and it might rightfully abandon the premises and decline to pay further rent. *Royce* v. *Guggenheim*, 106 Mass. 201. *Brown* v. *Holyoke Water Power Co.* 152 Mass. 463. Since the tenant was evicted by the landlord he is not obliged to return even if the cause of the eviction be removed: and no right to rent exists except upon a voluntary return of the tenant. *Cibel* v. *Hills*, 1 Leon. 110.

*Exceptions sustained.*