BLAUSTEIN ET AL., RESPONDENTS, *v.* PINCUS, APPELLANT.

(No. 3,228.)

(Submitted March 18, 1913.   Decided April 1, 1913.)

[131 Pac. 1064.]

*Landlord and Tenant—Constructive Eviction—Damages—Evidence—Past Profits—Admissibility—Briefs—Specification of Errors—Rules.*

Landlord and Tenant—Constructive Eviction—Evidence—Sufficiency.
  1.   Evidence in an action by a tenant against his landlord for damages based upon a constructive eviction, where the former, in reliance upon a five-year lease of a building theretofore occupied by him as a lodging-house, had made expensive alterations and improvements with a view to continuing in such business, and the latter, desirous of regaining possession of the premises for a more profitable use, but failing in his efforts to procure plaintiff's consent to a cancellation of the lease, erected a garage immediately adjoining the lodging-house, the noises and fumes originating in and emanating from which rendered the leased premises unfit for occupancy for lodging-house purposes, and caused plaintiff to quit the premises, *held,* sufficient to warrant a finding by the jury in favor of the latter.

Same—Acts of Third Persons—Defense not Available, When.
  2.   The acts of owners of automobiles who made use of defendant's garage, in getting them out and in, having been only such as defendant must have known would be incident to the use of the building as a garage, the contention that under the rule that the acts of third persons impairing the usefulness or enjoyment of demised premises do not amount to an eviction by the lessor, defendant could not be held responsible for the noise, fumes and smells created by them, was without merit.

Same—Damages—Past Profits—Admissibility.
  3.   Evidence of profits which plaintiff had actually realized during his occupancy of the premises prior to the acts of defendant which culminated in the former's eviction, objected to as incompetent, speculative and remote, was properly admitted in proof of damages sustained by plaintiff.

Appeal—Specification of Errors—Briefs—Disregard of Rule—Penalty.
  4.   A specification of errors made up of a mass of random narrative, unnumbered rulings of the trial court, explanatory statements and argumentative matter, in disregard of subdivision *b*, section 3, of Rule X of the supreme court, relative to what appellant's brief shall contain, lays the appeal open to dismissal.

*Appeal from District Court, Silver Bow County; J. Miller Smith, a Judge of the First Judicial District, presiding.*

ACTION by Max and Rosa Blaustein against Adolph Pincus. From a judgment for plaintiffs and an order denying his motion for a new trial, defendant appeals. Affirmed.

*Mr. J. L. Wines* and *Mr. T. J. Harrington,* for Appellant, submitted a brief; *Mr. Wines* argued the cause orally.

The covenant of quiet enjoyment protects the tenant only as against the successful assertion of a paramount right. If a tenant is disturbed in his enjoyment of the leased premises by one having an inferior right to his own, he has a remedy against the wrongdoer, either in an action for damages, or he may have an injunction. He must show a breach of the covenant of quiet enjoyment, and to constitute such a breach the act complained of must have been committed by one having a superior right to do such act than the tenant had to protect such right, and a better right than the tenant had to the enjoyment of his premises under his tenancy. Appellant insists that the same rule must apply in a case where a tenant has voluntarily abandoned the premises by reason of an alleged disturbance of his possession, and the one who is guilty of such acts, or causes such disturbance, must also, as in case of actual eviction, have a superior right to that of the tenant, who thus claims to have been constructively evicted. The covenant, "whether expressed or implied, means that the tenant shall not be evicted or disturbed by the lessor, or by persons deriving title from him, or by virtue of a title paramount to his, and implies no warranty against the acts of strangers. It is equivalent to a stipulation that the lessee shall not be rightfully disturbed in his possession during the term, not that he shall not be disturbed at all." (1 Taylor on Landlord and Tenant, 8th ed., sec. 305.) "But if the tenant is ousted by one who has no title, or in the language of the law, by strangers, it is a trespass for which the law leaves him to his remedy against the wrongdoer, since it arises from no fault of the landlord." (*Id.*)

Appellant, as landlord, could have maintained no action against the owners of the automobiles in question by reason of any failure on their part to comply with a covenant contained in the original lease between appellant and Angell and Zobel. It follows that there can be no action maintained as between them, neither by one or the other. It will thus be seen that if

appellant is liable to respondents in this case, by reason of the wrongful acts of these automobile owners, he is deprived of any remedy over against them on account of the fact that there is no relationship between them that makes one, in any sense whatever, liable for the acts of the other. (1 Tiffany on Landlord & Tenant, 810, sec. 123; *May* v. *Sheehy,* 4 Cranch C. C. 135, 16 Fed. Cas. No. 9335; see, also, *Wray-Austin Machinery Co.* v. *Flower,* 140 Mich. 452, 103 N. W. 873; *Wilson* v. *Martin,* 1 Denio (N. Y.), 602; *Gray* v. *Gaff,* 8 Mo. App. 329; 24 Cyc. 879, 880, and cases cited.)

Evidence was, permitted by the court of past profits, and upon this respondents rely as being sufficient evidence of what their future profits might have been. Appellant's contention is that even in cases where future profits may be proven with that certainty that is required, such evidence is not admissible, nor sufficient, unless it is shown that conditions at two periods of time were the same. (See *Masterton* v. *Village of Mount Vernon,* 58 N. Y. 391; *Carlson* v. *Koerner,* 226 Ill. 15, 80 N. E. 562; *McKinnon* v. *McEwan,* 48 Mich. 106, 42 Am. Rep. 458, 11 N. W. 828; *Allis* v. *McLean,* 48 Mich. 428, 12 N. W. 640; *Parke* v. *Frank,* 75 Cal. 364, 17 Pac. 427; *Hotchkiss* v. *Patterson,* 5 Kan. App. 358, 48 Pac. 435; 2 Sutherland on Damages, 402; *Taylor* v. *Maguire,* 13 Mo. 517; Rev. Codes, sec. 6049.)

*Messrs. Harry* and *William Meyer* submitted a brief in behalf of Respondents; the latter argued the cause orally.

The law is that the landlord is liable for the eviction of his tenants, even though said eviction is caused by the acts of another tenant. (*Lay* v. *Bennett,* 4 Colo. App. 252, 35 Pac. 748; *Smith* v. *McEnany,* 170 Mass. 26, 64 Am. St. Rep. 272, 48 N. E. 781; *Bailey* v. *Kelly,* 86 Kan. 911, 122 Pac. 1027; *Collins* v. *Lewis,* 53 Minn. 78, 19 L. R. A. 822, 54 N. W. 1056; *Duff* v. *Hart,* 16 N. Y. Supp. 163; 24 Cyc. 1132B.) What constitutes an eviction?

"A party should be held evicted when the act of the landlord is of such a character as to deprive the tenant, or has the effect of depriving him, of the beneficial use and enjoyment of

the whole or any part of the demised property, to the extent he is thus deprived." (*Pridgeon* v. *Excelsior Boat Club*, 66 Mich. 326, 33 N. W. 502; *Lay* v. *Bennett*, 4 Colo. App. 252, 35 Pac. 748; *Kitchen Bros. Hotel Co.* v. *Philbin*, 2 Neb. (Unof.) 340, 96 N. W. 487; *Herpolsheimer* v. *Funke*, 1 Neb. (Unof.) 471, 95 N. W. 688; *Smith* v. *McEnany*, 170 Mass. 26, 64 Am. St. Rep. 272, 48 N. E. 781; *Agoure* v. *Lewis*, 15 Cal. App. 71, 113 Pac. 882; *Brown et al.* v. *Holyoke Water Co.*, 152 Mass. 463, 23 Am. St. Rep. 844, 25 N. E. 966; *Coulter* v. *Norton*, 100 Mich. 389, 43 Am. St. Rep. 458, 59 N. W. 163; 24 Cyc. 1132.)

"Any sort of annoyance, unless, perhaps, a mere trespass affecting the occupation of the property let, which prevented the tenant from enjoying it in as ample a manner as he is entitled to by the terms of the lease, amounts to a breach." (*York* v. *Steward*, 21 Mont. 515, 43 L. R. A. 125, 55 Pac. 29; *Edmison* v. *Lowry*, 3 S. D. 77, 44 Am. St. Rep. 774, 17 L. R. A. 275, 52 N. W. 583; *Tallman* v. *Murphy*, 120 N. Y. 345, 24 N. E. 716; Jones on Landlord & Tenant, secs. 354, 356; *Sully* v. *Schmitt*, 147 N. Y. 248, 49 Am. St. Rep. 659, 41 N. E. 514, sec. 5222, Rev. Codes.) A case almost on all-fours with the case at bar, and where the acts of the landlord in leasing the premises to a tenant to be used as a garage were held to amount to an eviction, is the case of *Wade* v. *Herndl*, 127 Wis. 544, 7 Ann. Cas. 591, 5 L. R. A., n. s., 855, 107 N. W. 4; see, also, *McCall* v. *New York L. Ins. Co.*, 201 Mass. 223, 21 L. R. A., n. s., 38, 87 N. E. 582. Under these authorities, it will readily be seen that the acts of appellant, performed by and through his tenants, amount to a constructive eviction of appellant.

Where the landlord makes a building useless, whether it be done by his own actions or by the actions of other tenants, he nevertheless is responsible. (*Adams* v. *Werner*, 120 Mich. 432, 79 N. W. 636; *Lay* v. *Bennett*, 4 Colo. App. 252, 35 Pac. 750; *Boyer* v. *Commercial B. I. Co.*, 110 Iowa, 491, 81 N. W. 721; *Haggart* v. *Stehlin*, 137 Ind. 43, 22 L. R. A. 577, 35 N. E. 997.)

Nor will appellant be heard to say that his tenants, who created the noise resulting in the damage to respondents, are the ones

who should be held liable, either severally or jointly with appellant. This is not for him to say; respondents had a perfect right to proceed against him individually without joining the tenants. (*Case* v. *Minot,* 158 Mass. 577, 22 L. R. A. 536, 33 N. E. 700; *Northern Trust Co.* v. *Palmer,* 171 Ill. 383, 49 N. E. 553; *Willard* v. *Bunting,* 34 N. Y. 153; *Fish* v. *Dodge,* 4 Denio (N. Y.), 311, 47 Am. Dec. 254.)

The action of the trial court in admitting evidence concerning past profits and instructing the jury that respondents could recover for prospective profits was correct and in accord with the great weight of authority. (Jones on Landlord & Tenant, sec. 370; *Snow* v. *Pulitzer,* 142 N. Y. 263, 36 N. E. 1059; *Hall* v. *Horton,* 79 Iowa, 352, 44 N. W. 570; *Kitchen Bros. Hotel Co.* v. *Philbin,* 2 Neb. (Unof.) 340, 96 N. W. 487; *First Nat. Bank* v. *Carroll,* 35 Mont. 302, 88 Pac. 1014; *Skinner* v. *Gibson,* 86 Kan. 431, 121 Pac. 513; *Fort-Smith W. R. Co.* v. *Williams,* 30 Okl. 726, 121 Pac. 275; 13 Cyc. 49–53; 24 Cyc. 1060D.) In *Mensing* v. *Wright,* 8 Kan. 98, 119 Pac. 374, the supreme court of Kansas held not only that future profits could be recovered in an action of this kind, but also that evidence of past profits, the same as was done in this case, was proper. (See, also, *Alden* v. *Mayfield* (Cal.), 127 Pac. 48.)

MR. JUSTICE SANNER delivered the opinion of the court.

The admitted facts in this case are: That from March, 1908, to April 1, 1910, the respondents, Max and Rosa Blaustein, were tenants under lease from the appellant, Pincus, of what is known as the Casino Theater in Butte. On March 1, 1909, these parties entered into another lease for the same premises to run for five years after April 1, 1910. This lease was in the usual form, except that it contained provisions to the effect that the premises should be used as a lodging-house and not otherwise, and that the lessees might make alterations as they saw fit, at their own expense, and should keep the plumbing in repair. Among the avenues through which light and air were admitted into this building were five windows in the east wall which was exposed. It was understood by all the parties that the lessees contem-

plated changes and improvements in the interior and the installation of furniture in order that the premises should be suitable for lodging-house purposes. These improvements were made and the furniture was installed by the lessees. In May, 1910, Pincus bought the lots adjoining the Casino and thereafter erected thereon a two-story garage, using the east wall of the Casino as the west wall of the garage; and in July, 1910, leased the garage to Angell & Zobell, by whom it has since been occupied.

It is alleged in the complaint, and denied in the answer, that at the time Pincus commenced the erection of the garage, the plaintiffs were enjoying a profitable lodging-house business at the Casino; that he intended to, and did, so erect the garage as to cut off the light and air theretofore furnished to the Casino on that side, and so as to admit into the Casino the noises, smells and fumes necessarily incident to the running of a garage; that the tenant of Pincus kept said garage open day and night, and the noises, smells and fumes emanating therefrom were of a character to, and did, injure the plaintiffs in the quiet and peaceable possession of the Casino, rendered it unfit for lodging-house purposes, and so disturbed the plaintiffs' customers and lodgers that they quit, so that plaintiffs ceased to be able to conduct a profitable lodging-house business therein; that in consequence of all this, plaintiffs were evicted from the leased premises, to their damage as follows: Lost profits, $5,000; improvements rendered worthless, $4,042; furniture rendered worthless, $2,025.

The case was tried to a jury which returned a verdict for the plaintiffs awarding them damages in the sum of $9,500, and judgment was entered accordingly. Defendant presented his motion for new trial, and the trial court ordered that the same be granted unless the plaintiffs would submit to a reduction of the judgment to $3,395, in which case to stand denied. Plaintiffs accepted the condition imposed, and from the judgment as reduced, as well as from the order denying his motion for new trial, defendant Pincus has appealed.

That the jury were entirely warranted in finding for the respondents, there can be no question. The evidence in their [1] behalf alone—and it finds material support in appellant's case—abundantly shows that after the lease of March 1, 1909, was executed, and in contemplation of a peaceable and quiet tenure for the term thereof, they made material improvements in the Casino at a very considerable cost; that they installed furniture necessary to the running of a lodging-house and had worked up a profitable patronage. For several days prior to the 20th day of May, 1910, Pincus had made persistent efforts to get them to surrender the lease and give up the premises, in order that he might apply them to other and more profitable uses. The following extract from the testimony of Max Blaustein will illustrate the attitude of Pincus in this regard: "Mr. Pincus came across to me and said, 'Blaustein, I have something to talk with you. * * * I would like you to surrender the lease; turn me over the building back. * * * I will tell you the reason why. I want to build up here a garage which will bring me about $250 a month.' I said, 'Where will I hunt for my investments in the place?' and he says, 'Now, here, Blaustein, there is no use to chew the rag about; if you don't surrender me the lease on the building, I will drive you from the place.' I said, 'How is that, Mr. Pincus?' and Mr. Pincus said, 'Now, here. You remember I told you I owned some ground east of the building.' I said, 'Yes, I do.' He said, 'I am going to buy the rest of the ground, what I need for a garage, from the Centennial Brewery, and I build up a garage and you shall know for the smoke and the noise of all automobiles and the bad odor, the only thing that was made for to allow light and ventilation, and that is the way I will drive you out of the place.'" Within a week after this conversation the construction of a garage on the adjoining lots was commenced. In the construction the windows in the east wall of the Casino—which formed the west wall of the garage—were not walled or boarded up but were nailed down so that they could not be moved. As to the character and effect of the noises, smells and fumes which

found their way into the lodging-house from the garage, the testimony is quaint but clearly founded upon personal experience. Max Blaustein testified: "I do not know how to explain the noise but I have seen the men getting out and cranking the machinery and then jumping in the machine and going out, and that would take only a half a minute sometimes. And then I have seen them going ahead and cranking the machine, turning it around three or four times, having a hold of a crank or a handle in the front, then he would go and open the hinges and start to look on the inside and that thing would be working away, and there is no question about it but what sometimes the automobile it is shaking and it stands in one place and shakes, and then he goes off for a hammer or a screw-driver or some other kind of a tool to fix something and the machine stands there and raises the dickens. Of course, I could hear it when I was looking at it. I could also hear it when I was in the lodging-house on the second floor, but I won't say I could hear it just as plain as when I was standing there looking at it."

Rosa Blaustein testified: "I would see smoke in the lodging-house. I knew it came from the garage. This smell that was there was from the gasoline, and there were all kinds of smells and I could hardly catch my breath when I used to go in. Sometimes I used to count the clothes for the laundryman, * * * the linen was full of gasoline and full of smoke; full of the smell of gasoline and the smoke. I heard noises while I would be in the lodging-house. Any time the automobiles would come in at night, there was all kinds of noises; the automobile horns would be blowing, and when they go out—there is [a] floor upstairs—it was clear upstairs—driving the automobiles was something terrible. And I used to stay sometimes at night in the lodging-house and used to go in the office and sometimes Bulgarians, I couldn't make out what they want; they make all kinds of noise and I should give back their money, and sometimes they used to be upstairs, the most room, you know, upstairs, and they want I should give them back their money, they couldn't stay."

Joseph Blaustein testified: "After the garage was built I noticed that there was considerable noise, a smell and a peculiar odor. The noise which I noticed there was the tooting of the horns, combined with the cranking of the automobiles and the continuous loud and boisterous noise. It was the after-effect of the cranking of the automobiles. This noise was going on when I went on shift, and it would continue as long as I was there. There would be intervals between the noise. It was a very loud noise. It was plainly heard in the lodging-house and that is where I heard it.   *   *   *   The odor was a sort of nauseating, occasioning a sort of peculiar sickness of the stomach as though you were about to vomit.   *   *   *   I have noticed smoke in the lodging-house. It would be coming through the windows downstairs. As to being thick or otherwise, I will say that smoke would vary; sometimes it was thick, other times it was not. It was so that you could notice it. This continued from the time the garage was built until we finally left the place."

Jim Mike testified: "I used to room there when the garage was built. I remained there as a lodger about four weeks after it was built and opened for business.   *   *   *   After the garage moved in there and opened for business there was a lot of noise and smell.   *   *   *   There was an awful smell of gasoline there; it was hard to stay in there on account of the smell.   *   *   *   The effect it had upon me and the other lodgers was to make us sick and we couldn't stand it.   *   *   *   I couldn't get any rest there after the garage was built.   *   *   *   The reason I left there was on account of the noise and smell. I remained in the city after I left there."

Similar testimony was furnished by other witnesses who had lodged with the plaintiffs but who were compelled to leave on account of the noises, smoke and smell from the garage; and this condition became so serious that the plaintiffs, having lost most of their patronage and being no longer able to profitably conduct a lodging-house in the Casino, were obliged to and did quit the premises in December, 1910. In the interim, however, they

made complaints of the condition to Pincus and requests of him for relief, and his invariable answer, it seems, was: "Blaustein, I told you what would be the result of it"; or "Mrs. Blaustein, I told you the consequence, what it will be."

Appellant concedes that in the lease in question there is implied a covenant for quiet enjoyment. That the circumstances disclosed by the evidence were such as to destroy the quiet enjoyment of the Casino by the respondents, were sufficient to justify them in quitting the premises and were tantamount to an eviction is too clear for discussion. (*York* v. *Steward,* 21 Mont. 515, 43 L. R. A. 125, 55 Pac. 29; *Osmers* v. *Furey,* 32 Mont. 581, 81 Pac. 345; *Wade* v. *Herndl,* 127 Wis. 544, 7 Ann. Cas. 591, 5 L. R. A., n. s., 855, 107 N. W. 4; *McCall* v. *New York L. Ins. Co.,* 201 Mass. 223, 21 L. R. A., n. s., 38, 87 N. E. 582; *Adams* v. *Werner,* 120 Mich. 432, 79 N. W. 636; *Lay* v. *Bennett,* 4 Colo. App. 252, 35 Pac. 748; *Tallman* v. *Murphy,* 120 N. Y. 345, 24 N. E. 716; *Northern Trust Co.* v. *Palmer,* 171 Ill. 383, 49 N. E. 553; *Fish* v. *Dodge,* 4 Denio (N. Y.), 311, 47 Am. Dec. 254; *De Palma* v. *Weinman,* 15 N. M. 68, 24 L. R. A., n. s., 427, 103 Pac. 782.)

We are unable to appreciate the argument of appellant that because the tenants of the garage owned no machines, and the [2] noises, fumes and smells were occasioned by the acts of private owners who merely rented stalls in the garage, there was no such privity with Pincus as to render him responsible. Doubtless it is the rule that the acts of third persons impairing the usefulness or enjoyment of demised premises do not amount to an eviction by the lessor (24 Cyc. 1132); but nothing is shown to have occurred that might not be expected to occur in a garage; the getting of the machines in and out of the garage, whether by private owners or others, was a necessary incident in the business of the garage, as was also whatever noises, smells or fumes might arise out of that process. It was to accommodate the business of a garage that Pincus designed, built and rented the building, with full knowledge of the annoyance it might cause to the respondents. It is not at all clear that all the noises, fumes and smells were generated by the acts of private owners

or that the lessees of the garage were in every instance innocent of actual participation therein; but whether this be so or not, it would be the refinement of artificiality to hold Pincus blameless for a result so clearly contemplated and foreseen.

2. It is insisted, however, that the damages allowed were not proven.  There was evidence to show that after the execution of the lease and before the disturbances complained of the respondents made important changes in the interior of the Casino, besides installing a heating plant, all of considerable cost and value; also that as the result of the operation of the garage the business of respondents was, as an instrument of profit, practically destroyed.  From these two elements alone, omitting furniture, it is not difficult to compute a sum equal to, or in excess of, the amount finally allowed by the trial court.  If anyone has cause to complain in this regard, it is not the appellant.

But it is urged the only evidence of damage on account of the loss of business and profits was incompetent, speculative and [3]   remote.  This has reference to the fact that as a basis of computation the court admitted evidence of profits which actually had been realized in the period of respondents' occupancy of the premises prior to the erection of the garage.  This evidence, instead of lacking the fundamentals of admissibility, was singularly complete; it disclosed a permanent business of a stable and certain character, in which the daily income and expense maintained a consistent average throughout the period from March, 1909, to July 1, 1910; commencing with July, 1910, and for no apparent cause except the garage, the income dropped to less than one-half, although no corresponding reduction in the expense of operation was possible.  We think this evidence was properly admitted (*First Nat. Bank of Portland* v. *Carroll*, 35 Mont. 302, 309, 88 Pac. 1012; *Snow* v. *Pulitzer*, 142 N. Y. 263, 36 N. E. 1059; *Schile* v. *Brokahus*, 80 N. Y. 614; *Kitchen Bros. Hotel Co.* v. *Philbin*, 2 Neb. (Unof.) 340, 96 N. W. 487; *Di Palma* v. *Weinman*, 16 N. M. 302, 121 Pac. 40; *Alden* v. *Mayfield*, 164 Cal. 6, 127 Pac. 45; *Mensing* v. *Wright*, 8 Kan. 98, 119 Pac. 374), and that it fairly sustained the burden assigned to it.

In view of the above conclusions, none of the rulings com-

plained of in the admission and exclusion of evidence presents any error prejudicial to appellant. Nor do we think the given instructions which are assigned as error are open to the objections urged against them on the trial. It is also clear that under the circumstances of this case the court was correct in modifying appellant's instructions numbered 1, 4, 7 and 17, and in refusing appellant's proposed instructions Nos. 2, 3, 6, 9, 11, 13, 15, 16, 19 and 20, since they were either framed on an erroneous theory or were inaccurate in phraseology, or were covered.

What is intended for an assignment of errors in appellant's brief covers twenty-eight pages and is a potpourri of random [4] narrative, rulings (unnumbered) of the trial court, explanatory statements and argumentative matter. This condition, counsel for respondents urge, entitles them to have the appeal dismissed, since it is unfair to them and has rendered their task of replying very difficult. An indisposition on our part to go to this length without warning has occasioned us much needless work in the effort to fairly review the trial proceedings. The rules relating to briefs, as promulgated November 20, 1911, are neither hard to understand nor laborious to follow; and we shall not again, in a similar situation, take the trouble that we have taken here to ascertain the character and value of appellant's contentions.

Finding no prejudicial error, the judgment and order appealed from are affirmed.

*Affirmed.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.

Rehearing denied May 3, 1913.