JAMES R. GILSON et al., Appellees, v. L. ROY GILLIA
and DOLLYE D. GILLIA, Appellants. —321 S. W. (2d)
855.

Western Section.   May 8, 1958.

Certiorari denied by Supreme Court October 3, 1958.

194

Hanover, Hanover, Hanover & Walsh, Memphis, for appellants.

Rosenfield, Borod, Fones & Bogatin, Memphis, for appellees.

CARNEY, J. The defendants below, L. Roy Gillia and Dollye D. Gillia, lessors, appeal from a decree of the Chancery Court of Shelby County awarding the complainants below, James R. Gilson, Merchants Equipment Manufacturing Co., Inc., and Merchants Hotel Supply, Inc., lessees, the sum of $2,500 as damages for failure to repair two brick buildings located at 911 and 915 South Rayner in Memphis, Tennessee. The decree also required the defendant lessors to perform specifically the lease contract by making certain structural repairs provided for in the lease contract.

The cause was tried to a jury who found the issues in favor of the complainant lessees.

Complainant, Mr. Gilson, was engaged in the business of manufacturing fixtures for department stores, hospitals, kitchens and restaurants. A goodly portion of such business involves the use of very expensive woods such as mahogany, walnut, rosewood and teakwood. These materials are purchased in panels of sizes 4′ x 8′

and 4' x 12'. While the prices vary depending upon the grade and species, Mr. Gilson testified that average prices are $1 per square foot for mahogany; $1.90 per square foot for walnut; $2.88 per square foot for rosewood; and $1.75 per square foot for teakwood. Obviously, the manufacture of such equipment from the expensive woods requires the use of skilled workmen.

Mr. Gilson leased the two buildings involved in this litigation from Mr. and Mrs. Gillia by written contract dated March 10, 1955. The two buildings which are of warehouse type construction and style are adjacent to each other on separate lots. Both lie on the west side of Rayner Street in Memphis, Tennessee.

The lot known as 911 Rayner Street contains a building 50 feet wide and approximately 200 feet long. Mr. Gilson leased the entire building on this lot.

Immediately south is the lot known as 915 Rayner Street on which is also located a brick warehouse building. This building is approximately 400 feet long, 50 feet wide on the east end and 35 feet wide in the back or west end. Mr. Gilson leased only the western half of this building, the portion leased by him being 35 feet wide and 200 feet long. The front or east end of the building at 915 Rayner was leased to and occupied by the Southern Joslyn Company and is not involved in this litigation. As a practical matter the east end occupied by Southern Joslyn Company is a separate building from the western half leased by Mr. Gilson separated by a fire wall and with a separate and different type roof.

There was an area approximately 15 feet wide between the two buildings leased by Mr. Gilson and which was occupied by switch tracks of the Union Railway Company

in order to furnish rail transportation service to the building at 911 Rayner and to both parts or portions of the building located at 915 Rayner.

The lease contract was executed by Mr. and Mrs. Gillia as lessors and James R. Gilson, d/b/a Merchants Equipment Manufacturing Company, lessee. At the time of the trial Mr. Gilson had assigned the lease to two separate corporations of which he was the sole stockholder, namely the Merchants Equipment Manufacturing Company, Inc., and Merchants Hotel Supply, Inc. The lease contract contemplated that Mr. Gilson might assign the lease contract to one or more corporations but expressly provided that he personally should remain liable to Mr. and Mrs. Gillia, lessors, for the rent and other terms of the lease.

The total area contained in the two buildings leased by Mr. Gilson from Mr. Gillia and wife comprises some 17,000 square feet of floor space for which Mr. Gilson contracted to pay the sum of $570 per month.

The contract is too long to copy in full in this opinion. Paragraphs 1 through 31 were mimeographed and paragraphs 32 through 42 were typewritten.

From said contract we copy the following paragraphs which we deem pertinent to the issues involved in this case:

"17. To hold the Lessor harmless against all damages, accidents, and injuries to persons or property, caused by, or resulting from, or in common with, any power plant, machinery, elevator shaft, stairway, signs, awnings, glass, brick, or other building material; hatch, coal chute, or other openings, flag pole,

and any other things in, or pertaining to any other parts of said buildings or premises during the term of this lease while the Lessee is occupying the premises.

\* \* \* \* \* \*

"21. The Lessor reserves the right during the term of this lease to enter said premises at reasonable hours, to show same to other persons who may be interested in renting or buying the property, and for the purpose of inspecting the premises, and to make such repairs, additions, or improvements, as the Lessor may deem necessary, for the protection and preservation of said building and premises; but the Lessor is not bound to make any repairs whatever except those repairs due to structural defects, including exterior leaks, nor to be held liable for any damage in consequence of leaks, or for the stoppages in water, sewer, gas, or drain pipes, by reason of freezing, or other cause or obstruction, nor for any other defect about the building or premises, the Lessee having examined the same, and being satisfied therewith; but should such leaks, obstructions, freezing, stoppages, or other defects about the building and premises occur during the term of this lease, or while the Lessee is occupying the premises, then the Lessee shall remedy the same promptly at the Lessee's expense, unless the Lessor, by written agreement, undertakes to do the same.

\* \* \* \* \* \*

"37. If any repairs of emergency nature develop on said premises, for which lessors are responsible under the terms of this lease, and lessors cannot be

contacted within a reasonable time, due to their absence from the city, or for any other reason, the lessee shall have the right to obtain three (3) bids on such repairs from reputable contractors in the City of Memphis, and to have the work performed by the lowest and best bidder, but such repairs shall in no event exceed the sum of five hundred dollars ($500.00), and the lessors bind themselves to reimburse the lessee for such repairs so made, upon showing of proper evidence that said work has been done by the lessee.

"38. The lessors agree to put the building herein leased in tenantable condition for the lessee, and all necessary repairs will be made without undue delay, including grading on the driveway and in the rear of 911 Rayner. * * *"

Complainant, Gilson, began moving his equipment and materials into the building on or about April 1, 1955. After October 1, 1956, the buildings were occupied by the two corporations named above which had been formed by Mr. Gilson and were owned entirely by him.

Shortly after Mr. Gilson had entered into possession of the buildings, he began making complaints to Mr. Gillia that the roofs were leaking and that water was seeping into the buildings through the walls. Mr. Gillia made repairs to the roof on several occasions and then refused to make further repairs saying that he had performed all that was required of him under the contract.

On January 18, 1957, the complainant, Gilson, individually, and on behalf of the two corporate assignees of the lease contract filed the original bill in this cause seeking a recovery of damages from water leaking through the

roof and seeping through the walls. The bill also prayed that the defendant lessor be required to repair the structural defects in the building or in the alternative that the lease be cancelled.

The defendants filed an answer and cross bill in which they:

1. Averred that they had made all repairs required of them under the lease contract.

2. Denied that the premises were untenantable or in dangerous condition.

3. Denied that complainants had been damaged by leaks from structural defects.

4. Denied that the complainants were entitled to any relief.

5. Assumed attitude of cross complainant and averred that complainant Gilson had taken warehouse space for office space in violation of the contract.

6. Averred that by failure of Gilson to make repairs to windows and door frames the buildings had been damaged.

7. Averred that Gilson had erected some platforms for the storage of materials and suspended them from the rafters or trusses and had allowed rubbish and debris to accumulate around the building in violation of the contract.

8. Prayed that the lease contract be declared null and void or in the alternative prayed that they be awarded damages for breach of conditions by lessee, cross defendant.

9. Prayed that mandatory injunction issue requiring removal of the platforms, rubbish and debris.

The issues of fact submitted to the jury and their findings thereon are as follows:

"1. Were there any structural defects in the premises, including exterior leaks at the time of execution of the lease?

"Answer: Yes.

"2. If the answer to question No. 1 is 'yes', did the defendant lessors fail to put the premises leased in tenantable condition, including the making of necessary repairs and grading, as provided in the lease?

"Answer: Yes.

"3. Were there any structural defects in the premises, including exterior leaks, during the occupancy of the premises by complainants?

"Answer: Yes.

"4. If the answer to question No. 3 is 'yes', did the defendant lessors fail to make those repairs due to structural defects, including exterior leaks, as provided by the lease?

"Answer: Yes.

"5. If the answers to question No. 2 or No. 4 are 'yes' assess the damages to which complainants are entitled.

"Answer: $2500.00"

The Chancellor gave a decree on the verdict of the jury as follows:

"The cause having come on to be further heard upon the pleadings in the cause, the findings of the Jury and their answers to the issues, the proof adduced at the hearing, the entire record in the cause Defendants' motion for a new trial and Complainants' motion for a Decree, upon consideration of all thereof by the Court, it is ordered, adjudged and decreed:

"1. That the cross-bill filed by Defendants and Cross-Complainants, L. Roy Gillia and Dollye D. Gillia, be and the same is dismissed without prejudice, because same was prematurely filed.

"2. That defendants' motion for a new trial be and the same is overruled and disallowed and Complainants' motion for a Decree upon the verdict of the Jury be and the same is sustained.

"3. That Complainants, James R. Gilson, Merchants Equipment Manufacturing Company, and Merchants Hotel Supply Inc. have and recover of L. Roy Gillia and Dollye D. Gillia, the sum of Two Thousand Five Hundred ($2,500.00) Dollars and the costs of this cause, for all of which execution will issue as at law.

"4. Further, that Defendants are to specifically perform the subject contract by making repairs, due to structural defects, including exterior leaks, as provided by the lease.

"Rives A. Manker
Chancellor"

Assignment of error No. II insists that the Chancellor was in error in refusing to grant the defendants' motion made at the close of complainants' proof to withdraw the issues from the jury and to dismiss the complainants' bill.

The appellants, Mr. and Mrs. Gillia, contend that under the provisions of sections 17 and 21 above quoted they are exempt from liability for the damages alleged to have been sustained by the complainants.

Mr. Gilson testified that after reading a newspaper advertisement he inspected one of the buildings in the presence of Mr. Gillia. On account of an extensive amount of debris and equipment left by a previous tenant they could not inspect the other building. He said that obviously the roof had been leaking in many places, the plaster was falling down, door openings had been pushed out and shattered in several places, the driveways were in bad condition and that he told Mr. Gillia that they could not do business in the buildings in such condition. Further, he testified that Mr. Gillia fully understood the nature of his business, that he would be working with these high-grade species of wood and agreed to put the building in shape for him. Mr. Gilson testified that because of his apprehension and the difficulty he had suffered in a building which he previously occupied he was concerned about having everything in order and it was at his insistence that paragraphs 37 and 38 were written into and added to the mimeographed provisions of the lease contract.

The proof shows that while Mr. Gillia did make some repairs to the roof; and did do some grading on the driveways; and did hang one or more new doors on the build-

ing; and did waterproof a portion of the walls; yet Mr. Gilson repeatedly wrote to and notified Mr. Gillia that the leaks had not been fixed and that the roof continued to leak and that water was coming into the building by seeping through the walls and running through the doors across the floor.

Mr. Delugach, a building contractor, testified as a witness for Mr. Gilson that the buildings were of poor construction and at the time of the trial at least one of the trusses was not properly sitting on the pilaster; that some of the brick in the sustaining or support wall were loose; that a great deal of work needed to be done on the buildings to make them watertight and that, in substance, the buildings were actually dangerous to some extent.

Mr. Gilson contended that on thirty-eight different occasions some of his workmen had to move their tools, work benches, materials, etc., from one portion of the building to another because of the flooding of the building and the leaking of the roof and seepage of water through the walls and then move back again to the regular places of work after the rains had ceased and the waters had subsided. He testified that these seventy-six moves involved a total labor cost of approximately $3,100. In addition, he testified that he sustained some $456 in damages for loss of use of the leased space because of the flooded conditions.

We copy a portion of Mr. Gilson's testimony relating to the inconvenience and damages which he alleges that he sustained as a result of the many floodings of the building.

"Q. Mr. Gilson, in what manner have these various conditions about which you have testified, and

which have been depicted, introduced, affected the operations of your business? A. The leakage first to the roof has stained valuable raw materials and finished work; water running on walnut, mahogany, rosewood and teakwood in its raw state so stains it that it cannot be used in the job.

"Our materials are very expensive, and are purchased in sheets. Prices vary, depending upon the grade and species; Mahogany about $1.00 a square foot; walnut $1.90 to $1.18 a square foot; rosewood $2.88 per square foot; for the teakwood $1.75 in its raw state. These panels often run 4 x 8 to 4 x 12 feet square finished.

"Consider a single case: Let us take for example a department store that displays products such as jewelry and perfume, and would probably require a six-foot showcase. A showcase of that size may cost us as much as four or five or six hundred dollars a single case. Water coming through the leaks can stain it in partially finished condition or finished condition and make it necessary for us to rework it. We have sustained great losses through loss of time. When we get flooding through the walls which has been practically a constant thing, our men who necessarily work in those locations, because where those windows are that is where air-driven equipment is situated, electrical equipment is situated, where work benches and lights are situated, they have to pick up benches and tools and work and find other places, if available, and move everything their work materials and tools to storage areas where we can't have proper lighting. Oftentimes our crews have to stop what they are doing, obtain sawdust from the saw-

dust bins in buckets and wheelbarrow it across to the buildings, pour the sawdust down to soak up the water and try to dam the flow at the source and back it up and go through the process all over again.

"It is oftentimes impossible to schedule work efficiently, because we must have sufficient space in order to lay out the work. For instance we designed the Council Chamber in the Courthouse which had to be perfectly fitted at the factory before it came here. In order to do it, we had to set up the whole Courtroom in our shop, level, plumb and true, with adequate space. We can't do that. We have to guess. If we had full use of all our space, we would have adequate space. Not having it, we were denied the efficient use of our buildings. Our finishing department suffers a great deal because varnishes, such as we use in our business, must be put on under reasonably dry conditions. The water puddles on the floor constantly evaporates into the air to where it is relatively wet. When that is done, they have to stop and wait for a day when the humidity is gone, when they can do the job properly. Rainwater running through the roof leaves wet streaks. When that occurs we have to do it over. We use kiln-dried cabinet lumber. Six percent to eight percent moisture is the tolerance, I believe. We can get them both into finished work and get high humidity into the plant; and consider the expansion of the woods, planks crack open, wood warps, and we have to do the work over again. If we have material stored and it absorbs moisture from high humidity where the reverse happens, get into a dry spell and the work shrinks and it is cause for rejection. We have had packing

cases full of merchandise, which when they are caught in the flood, simply fall apart. Packing cases containing china, glassware, woodenware, of course, and our raw materials, plywood. Our men work under dangerous conditions when using electric equipment, electric drills, they are standing in water and if the electric drills should develop a short, a man could be killed. So when it is continuously happening we have to arrange ways to get these cords up in the air so there is no possibility of the cords dangling into the water. Ordinarily, a mechanic working on our type work has an opportunity to lay his work down, his tools down, on the floor. It is a normal habit developed through years and years of traditional procedure. He can't do that. When the floors are wet he must walk maybe dozens of feet to lay his tools down on the bench, go back to his work and consume a great deal of time.

"Other losses, when we have to spend time moving equipment or relocating it, or moving our work benches, or moving our men, or sweeping up water when the mechanics should be building with it. We have to make that up on overtime at time and a half rates.

"Q. Do your contracts require that the work be completed within a certain time? A. Yes, they do. Every store that we contract has a written completion date in the contract. This is necessarily so because the buildings are built and the advertising programs are advertised widely. Case in point: Lowenstein's South Shopping Center, I think perhaps that is the best known. It was advertised to open on a certain date, I believe, August 1. Had we

not completed our contract there would be no reason why the City Stores Corporation could not hold us responsible for any loss that might result because our contract was not fulfilled on the completion date.

"Q. Have you made an effort to raise various levels on cabinet work by placing pallets underneath them? A. That is a constant condition. We have to raise pallets and raise everything off the floor because some of this work can't be done well that way. We may set up a complete side of a department store and it has to be set up level. In order to do that they have to set little levels because when they get fifty or one hundred miles from here, when they get a 2 x 4 on pallets it is practically impossible to make things level. We are hard put to get our work conveniently and efficiently built under those conditions.

"Q. Have these conditions affected you in any way in regard to your shipping or receiving facilities? A. Yes, they have. The driveways remain in a constant state of mud. The trucks coming into the drive and going back into the door where we must necessarily load our equipment out and into the building, in order to get through the mud you have to get a certain amount of momentum, the necessary amount of power to keep moving. If they stop, they get stuck. On several instances the trucks can't stop. They keep sliding in the mud and go into the wall. Of course, we have been able to catch those things and get the insurance companies of the people who represent the truckers to repair the damage or pay for the damage. However, the truckers work on an hourly basis and when they have to pull their trucks

out with additional trucks, we pay for it. When they are stuck in the mud and wreck their trucks and wait for a tow or use lighter trucks we have to pay for it on the elapsed time. If the conditions were such as to get the trucks in and out, it would go much more efficiently. The mud is so thick quite often our men can't get outside the door to handle equipment efficiently. It is difficult to handle heavy equipment because of unstable footing. * * *" (Tr. p. 109-113.)

The appellants, Mr. and Mrs. Gillia, insist that a landlord, by stipulation in a lease agreement, may exempt himself from liability for damages caused by defects in leased premises and rely very strongly upon the case of Robinson v. Tate, 34 Tenn. App. 215, 236 S. W. (2d) 445, and 32 Am. Jur. 615, Section 739, in support of their contention.

We agree with this general statement. However, we feel compelled respectfully to disagree with the insistence that the holding of Robinson v. Tate is controlling in the case at bar. In Robinson v. Tate the damages sustained by the tenant were the result of steam escaping from a defective radiator valve and not from damages for water coming into the building from the outside as in the present case. The tenant was holding under a lease which was contained on a printed form and apparently identical with the lease in the present case through paragraph 31. Paragraphs 17 and 21 were relied upon by the defendant landlord or lessor in Robinson v. Tate just as they are relied upon in the present case by the defendant lessors, Mr. and Mrs. Gillia.

In Robinson v. Tate this court affirmed judgment of $1,700 in favor of the tenant against the landlord and held that the provisions of sections 17 and 21 of the contract, though valid, did not exempt the landlord from liability under the facts proven in that case. In addition, the lease in the present case contains some eleven additional typewritten paragraphs which apparently were not contained in the printed lease in Robinson v. Tate.

Section 38 of the lease between Mr. and Mrs. Gillia and Mr. Gilson quoted above expressly bound the lessors to make the repairs necessary to put the premises in tenantable condition.

We think there was ample evidence to justify the Chancellor in overruling the defendants' motion to withdraw the issues from the jury and to dismiss the complainants' bill. Accordingly, assignment of error No. II is respectfully overruled.

Assignment of error No. III insists that the Chancellor should have granted defendants' motion to withdraw the issues from the jury at the conclusion of all the testimony.

The testimony of Mr. Gillia and his witnesses is that the leaks were substantially repaired in the roof; that the complainants had sustained very little, if any, damage from water coming into the building by external defects; and that the buildings were now in good shape and in a tenantable condition. At most this testimony made issues of fact for the jury as to the condition of the building before and after occupancy by Mr. Gilson as to the repairs needed and made by Mr. Gillia, and the amount of damages, if any, sustained by Mr. Gilson.

Hence, what we have said in overruling assignment of error No. II applies equally to assignment of Error No. III which is respectfully overruled.

Assignment of error No. IV is as follows:

"The Court erred in refusing to instruct the jury as set out in the defendants' 'Special Instruction to Jury No. 1,' as follows:

" 'Provisions 17 and 21 of the original lease agreement between the parties, executed March 10, 1955, for the rental of the premises at 911-915 Rayner, provided that the landlord shall not be liable for any damages in consequence of leaks, or stoppages in water, sewer, or drain pipes, by reason of freezing, or any other cause of obstruction, nor for any other defect about the building or premises, and the Court charges you that the landlord in Tennessee may make such an agreement, exempting the landlord from liability.

" 'The Court further charges you that if you find from the preponderance of the evidence in this cause that the complainants, J. R. Gilson or Merchants' Equipment Manufacturing Company, suffered any damages by reason of leaks, or for any other cause, then in that event, the landlord will not be liable for damages to the tenant, and your verdict should be for the defendant, Gillia.' "

In our opinion this special request No. 1 is predicated upon an incorrect construction of the legal effect of the entire lease contract and for this reason as well as others we think His Honor the Chancellor was eminently correct in refusing to give this charge to the jury.

██ We find another assignment of error numbered IV which complains of the failure of the Chancellor to charge special instruction No. 2 which is as follows:

"If you find from the preponderance of the evidence that the complainant Gilson or Merchants Equipment Manufacturing Company had equal or greater knowledge than the defendant of the condition of the premises in question, which brought about the damage to the property, if you find that it was damaged, and that the complainants failed to act upon such knowledge, but continued to sit idly by, without taking steps to minimize their damages, knowing that the landlord failed or refused to comply with his lease agreement to make certain repairs at the beginning of the lease, and that said failure to act upon such knowledge, thereby proximately contributed to their own damage, then the Court instructs you that the complainants cannot recover against the defendant Gillia, and that the verdict should be for the defendant Gillia."

For convenience we designate this as assignment of error IV-A. This assignment of error must be overruled. The jury in a chancery case does not render a general verdict for or against a party as at law but only responds to the issues as by special verdict. The court decides the questions of law involved. State ex rel Mynatt v. King, 1916, 137 Tenn. 17, 191 S. W. 352; T. C. A. sec. 21-1014.

██ Assignment of error No. V is as follows:

"The Court erred in refusing to instruct the jury as to defendants' 'Special Instruction to Jury No. 5,' as follows:

" 'The Court further instructs you that, if you find from the evidence that there was an agreement to repair the premises at the beginning of the lease by the landlord, and that the landlord made these repairs, there is no warranty by the landlord that the repairs made will continue to remain throughout the lease in the same manner as when made.' "

The Chancellor correctly refused to give this charge because the question as to whether there was an agreement to repair the premises at the beginning of the lease by the landlord presents a question of law and not a question of fact since the complainants' suit is predicated upon a written lease contract.

Assignment of error No. VI is as follows:

"The Court erred in refusing to instruct the jury as to the defendants' 'Special Instruction to Jury No. 6,' as follows.

" 'The court further instructs you that one whose property has been damaged by the acts or conduct of the landlord was bound to lessen the damage by the use of ordinary care and diligence.' "

Assuming that it was necessary and proper that the court instruct the jury as to the law on this question in order that they might more intelligently render their verdict on the issues of fact, we are of opinion that His Honor substantially and adequately covered the subject in his instruction to the jury and therefore was not in error in refusing to give special request No. 6. Hence, this assignment of error is respectfully overruled.

■■ Assignment of error No. VII is as follows:

"The Court erred in refusing to give to the jury for their consideration the following issue submitted by the defendants:

" 'Did the complainant take any steps or do anything within his power to minimize or lessen the damages to his property? Answer yes or no.' "

As a general rule one who is injured by the wrongful or negligent acts of another, whether as a result of a tort or of a breach of contract, is bound to exercise reasonable care and diligence to avoid loss or to minimize or lessen the resulting damage and to the extent that his damages are the result of his active and unreasonable enhancement thereof or are due to his failure to exercise such care and diligence, he cannot recover. 15 Am. Jur., Damages, Section 27, page 420.

The Chancellor submitted no issue of fact involving the question of minimizing of damages on the part of the complainants. Instead he instructed the jury that if they found that the complainant had failed to exercise reasonable care and diligence to lessen their damage the award to the complainants should be lessened accordingly.

It is to be noted that issue of fact No. 5 asks the jury to assess the "damages to which complainants are entitled." In our opinion it would have been more proper to use the phrase "damages which the complainants sustained." Under this instruction we do not know whether the jury found that the complainants' damages were more than $2,500 and that the jury reduced the amount of the award because of the complainants' failure to exercise due diligence in minimizing their damages or

whether the jury found that the complainants had exercised due diligence to minimize their damages and made an award of $2,500 as the entire amount of the complainants' damages sustained as a result of the failure of the defendants to repair.

In our opinion an issue of fact similar to that contained in the above request as to the complainants' diligence in minimizing their damages should have been submitted to the jury. However, we think such issue of fact should have been accompanied by another issue of fact requiring the jury, if it found lack of diligence on the part of the complainants, to ascertain the amount by which the complainants' damages could have been minimized by due diligence.

The defendants do not assign error on issue of fact No. 5 as submitted to the jury and they assign no error as to the charge of the court to the jury authorizing them to minimize the amount of the award to complainants under issue of fact No. 5. The finding of the jury on issue of fact No. 5 under the charge of the court having been approved by the court and decree having been entered thereon and being unappealed from, such finding is now binding upon this court and we can see no reversible error in failure of the Chancellor to charge the special request quoted above. For this reason the assignment of error must be overruled. T. C. A. sec. 27-117.

Assignment of error No. VIII complains that the award of the jury for $2,500 is to all three complainants collectively and there is no allocation or division of the award among the three complainants. It will be remembered that the complainant, Gilson, is the sole owner of both corporations and is the real party in interest to the

entire $2,500. No request was made by the defendants to have the jury or the Chancellor prorate the amount of the award. No question was made in the pleadings at any time as to the right of the three complainants to join in this bill. We are cited to no authority which holds that an award may not be made to plaintiffs collectively. Certainly, it is too late for the defendants to raise this question after the case has been finally submitted to the jury. Hence the assignment of error is respectfully overruled.

Assignment of error No. I is as follows:

"The Court erred, upon motion made by the defendants, in refusing to strike from the evidence the testimony of the complainant Gilson, with reference to the amount of damage alleged to have been sustained by the complainants."

In arriving at the amount of damages sustained by him in moving the crews out of the flooded area of the building and back some thirty-eight times, Mr. Gilson produced records showing the weekly time of each employee involved. Appellants contend that the daily time cards showing the number of employees working on the days in question were available to the complainants and were not produced in court. Hence, he insists that the court should have stricken this evidence from the record. There is nothing to indicate that the defendants called for these other time cards. The record shows sufficient evidence upon which the jury could find with reasonable certainty the amount of damages sustained by the complainants. Hence, the Chancellor was correct in overruling the motion to strike the evidence of complainant Gilson with reference to the amount of his damage and the manner in which he arrived at the same.

Assignment of error No. IX insists that the Chancellor erred in decreeing that the defendants are required to perform specifically the contract by making repairs, due to structural defects, including external leaks, as provided by the lease.

Specific performance, being an equitable remedy, is the substitute for the legal remedy of compensation when the legal remedy is inadequate or impracticable, and, therefore, lies within the sound judicial discretion of the court upon a consideration of all the facts and circumstances surrounding the transaction. Brown & Sons v. Boston & M. R. R., 106 Me. 248, 76 A. 692, and cases cited; Dawkins v. Koch, 12 Tenn. App. 220-227.

The broad ground of jurisdiction by the Chancery Court of specific performance cases is the inadequacy, or the impracticability, of damages to do complete justice to the injured party. Hence, where damages are practicable, and would be adequate, the court, as a rule, will not compel a specific performance, but will leave the complainant to his remedies at law or will itself award damages. Gibson's Suits in Chancery, 5th Edition, Vol. II, Section 995, page 237.

It appears to this court that probably the complainants cannot be compensated adequately by damages. The efficiency of their operations is greatly impaired by the necessity of having to move men, materials and equipment from one part of the building to another every time there is an appreciable amount of rainfall.

Yet on the other hand the matter of compliance with the decree for specific performance presents a great problem to the defendants and the matter of enforcement of the decree a great problem to the court. The evidence

is by no means clear as to the extent of work which will be necessary to repair adequately the building suitable to the complainants' occupancy thereof under the terms of the original lease contract. One of complainants' witnesses said the building should be torn down and started all over again.

If it were simply a matter of repairing a roof or replacing a roof it would not present too great a burden upon the court of upon the defendants to require them to do so. One of the complainants' witnesses testified that at least one of the trusses supporting the roof is not sitting properly upon the pilaster, that some of the walls are defective and that the building is actually dangerous.

It is true that the defendants covenanted to make the building habitable for use and occupancy by the complainant, Gilson, and his assignees and covenanted to make repairs of structural defects including external leaks and these covenants have been adjudged to have been breached by the jury. Yet it certainly appears that the parties did not contemplate extensive remodeling and rebuilding of these buildings in order to perform said covenants, and the defendants still insist that the buildings are structurally sound and need little, if any, additional repairs.

Therefore, under all of the facts and circumstances it would seem that the decree requiring specific performance would work an undue hardship upon the defendants in the performance thereof and upon the court in the enforcement thereof. On the other hand, we think it would work an injustice upon the complainants to require them to continue to do business under the same conditions which have prevailed for the past several months.

For these reasons we think the complainants should be given the option of terminating the least contract if they prefer. It is to be noticed that the original bill prayed in the alternative that the lease contract be cancelled. The Defendants' cross bill which was dismissed without prejudice also asked in the alternative that the lease contract be cancelled.

In 32 Am. Jur., Landlord and Tenant, Section 731, page 605, the statement is made that the failure of the lessor to comply with his covenant to make improvements prior to the commencement of the term may justify the lessee in refusing to take possession, and if the failure to make improvements after the tenant takes possession renders the premises useless for the purposes of the lease, the tenant may abandon the premises and in either case be relieved from liability for rent.

Again from 32 Am. Jur., Landlord and Tenant, Section 514, page 420, "There is considerable authority for the proposition that if, as a result of the breach by the landlord of his covenant to repair, the leased premises become untenantable, uninhabitable, or unfit for the purpose for which they were leased, the tenant may abandon them and thereby avoid liability for further rent. This view is supported upon the ground that the failure to repair pursuant to the covenant works a constructive eviction, and also upon the ground that it impairs the consideration for the lease."

Our own Tennessee Supreme Court in the case of Boyd v. McCarty, 142 Tenn. 670, 222 S. W. 528, inferentially aligned itself with those courts which hold that the breach of an express covenant by the landlord to make repairs constitutes a constructive eviction. From said opinion

at page 675 of 142 Tenn., at page 529 of 222 S. W. we quote as follows:

"It is urged that the failure on the part of the complainant to repair these premises amounted to a constructive eviction of the defendants. This could not, however, be true unless the duty of making repairs rested upon the lessor.

" 'The mere fact, however, that the premises become untenantable if such condition is not the result of any wrongful act of commission or omission on the part of the landlord cannot be the basis of an eviction.' 16 R. C. L. p. 686.

" 'Eviction necessarily being the result of an intended, willful, wrongful act, it must be a willful, omission of duty or a commission of a wrongful act where there is no duty not complied with, and no wrongful act committed by the landlord toward the tenant, no eviction occurs.' Barrett v. Boddie, 158 Ill. 479, 42 N. E. 143, 49 Am. St. Rep. 172.

"Likewise it follows since the complainant here has not been guilty of the breach of any legal duty in failing to repair, she cannot be held to have breached the covenant for quiet enjoyment. Blaustein v. Pincus, 47 Mont. 202, 131 P. 1064, Ann. Cas. 1915C, 405 is not in point."

A decree will be entered in this court modifying the decree of the court below so as to award the complainants below a judgment for $2,500 damages together with interest from date of overruling the motion for new trial; eliminating the decree for specific performance; and giving the complainants the option to terminate the lease

contract without prejudice to their rights to make claim for and recover their subsequent damages sustained as a result of the failure of the defendants to make repairs as provided in the lease contract and as adjudged in this cause.

The cause will be remanded to the Chancery Court of Shelby County in order that the Chancellor may require the complainants to make an election whether to terminate the contract or to continue to hold thereunder. If the complaints elect to terminate the lease contract, His Honor, the Chancellor, will set the date and conditions for the vacation of the premises as well as make a final adjudication of the rights and liabilities of the parties under the lease contract in accordance with this opinion.

The costs accrued to date in the court below will be taxed against the defendants. The costs accruing in this court will be taxed one-half to the complainants and one-half to the defendants. The costs accruing in the court below upon the remand will be taxed by His Honor the Chancellor.

Avery, P. J. (Western Section), and Bejach, J., concur.