IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 17, 2007 Session

## N. C. EDWARDS, II v. CARLOCK NISSAN OF JACKSON, LLC, ET AL.

**A Direct Appeal from the Chancery Court for Madison County**
**No. 62829     The Honorable James F. Butler, Chancellor**

_____

**No. W2006-01316-COA-R3-CV - Filed April 9, 2007**

_____

Lessor/Appellee sued Lessee/Appellant for breach of contract due to Lessee/Appellant's alleged failure to maintain the leased building as required under the lease. The trial court entered Judgment in favor of Lessor/Appellee, which Judgment included damages for repairs to the building, lost rent, and attorney fees. Lessee/Appellant appeals. On appeal, Lessor/Appellee asks for attorney fees in defending this appeal. We affirm the judgment of the trial court and remand for a determination of appropriate appellate attorney fees.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

Jeffrey P. Boyd of Jackson, Tennessee for Appellants, Carlock Nissan of Jackson, LLC, Grover Clayborn Carlock, Sr., and Grover Clayborn Carlock, Jr.

William H. Shackelford, Jr. of Memphis, Tennessee for Appellee, N. C. Edwards, II

**OPINION**

On May 4, 1998, Mr. N.C. Edwards, II ( "Lessor," "Plaintiff," or "Appellee") sold his Nissan car dealership to Carlock Nissan of Jackson, L.L.C., which is owned and operated by Grover Clayborn Carlock, Sr., and Grover Clayborn Carlock, Jr. (together with Carlock Nissan of Jackson, L.L.C. and Grover Clayborn Carlock, Sr., "Carlock," "Lessee," "Defendant," or "Appellant"). In connection with the sale, Carlock entered into a lease agreement (the "Lease") to lease the building owned by Mr. Edwards at 721 South Highland Avenue in Jackson, Tennessee (the "Building").[1] By

---

[1] Pursuant to Sections 12.1-12.6 of the Lease, Grover Carlock, Sr. And Grover Carlock, Jr. entered into the Lease as guarantors consenting to the terms and conditions of the Lease.

its own terms, the Lease expired on April 30, 2003. However, Section 2.2 of the Lease provides for hold over by the Lessee and reads, in relevant part as follows:

> In the event Lessee does hold over after the expiration of this Lease and continues to occupy or remain in the premises without a written agreement with Lessor, any such holding over shall be deemed a monthly tenancy but otherwise subject to all the terms of this Lease and subject to the then designated rental amount.

Section 5.3 of the Lease requires Carlock to repair and maintain the Building and reads, in pertinent part, as follows:

> Lessee shall at its own expense, keep and maintain all improvements on said real property. Lessor shall be under no obligation to repair or replace any of the improvements on said Demised Premises. Lessee shall, at its own expense, keep and maintain the interior of the building in good condition and repair so as to return the Demised Premises to Lessor upon the termination of this Lease Agreement in the same condition as received, ordinary wear and tear, damage by fire or other casualty excepted. Lessee shall also be responsible for the maintenance and upkeep of the building exterior, all structural portions of the building, including the roof, plumbing, heating and air conditioning and wiring.

Furthermore, Sections 8.1 and 8.3 of the Lease read as follows:

> Section 8.1. Expiration. Upon the expiration of this Lease, the Lessee shall vacate the premises and return possession thereof to Lessor in the same condition as when received, ordinary wear and tear and casualty excepted.
>
> *                              *                    *
>
> Section 8.3. Lessee to Maintain and Return in Same Condition. Lessee agrees to maintain said property and return it to Lessor in the same condition as received by Lessee....

On or about May 4, 1998, Carlock took possession of the Building. At that time, the Building functioned as an active auto dealership. Carlock operated a Nissan dealership out of the Building until August 2002. At that time, Carlock moved its dealership out of the Building and into a new location on Vann Drive in Jackson, Tennessee. From August of 2002 until approximately February of 2003, Carlock operated its wholesale business out of the Building. Thereafter, Carlock allowed Uniserve (a company of which Mr. Carlock, Jr. Is a 50% partner) to operate out of the

Building. During this period, Mr. Edwards, pursuant to the Lease, erected a sign in front of the Building advertising its availability. However, Mr. Carlock, Jr. testified that old files and records, along with some spare parts that Carlock had acquired with the dealership, were allowed to remain in the Building after the April 30, 2003 expiration of the Lease. Furthermore, Carlock did not change the responsible party for the Building's utilities until June, 2003. Consequently, and pursuant to section 2.2 of the Lease, *see supra*, Carlock became a month-to-month tenant.

On May 5, 2003, a tornado hit Jackson, Tennessee. The Building sustained substantial structural and cosmetic damage as a result of this event. Both Mr. Carlock, Jr. and Mr. Edwards went to the Building the day after the tornado to survey the damage. The insurance claim, which totaled approximately $30,000 was paid by Mr. Edwards' carrier. The insurance payment, however, covered only the damage that was deemed to have occurred as a result of the tornado. Mr. Edwards alleges that there was some $17,000 in additional damages that existed prior to the tornado and which were caused by Carlock's lack of maintenance as required under the Lease. Nonetheless, Mr. Edwards bore the costs of refurbishing the Building. On or about April 4, 2004, Mr. Edwards sent a demand letter to Carlock seeking reimbursement for repairs to the Building that were not covered by the insurance settlement. The letter reads, in pertinent part, as follows:

> [A]t the time of the expiration of the Lease, you did not remove your property for almost two months, and the maintenance of the building was neglected or performed in ways that caused damages that I have had to repair....

> \*             \*             \*

> ...your lease expired on May 3, 2003. The tornado happened on May 4, 2003. You were to be totally out of the building by May 3, 2003. Your possessions were not removed until late June, 2003. I therefore was deprived of two months ability to rent the property. You did not change the utilities until the first week of June, 2003, which is further evidence of your continued possession of the property after surrender possession, the lease continued on a month to month basis.

The letter included an itemized list of damages deemed to have been caused by Carlock's lack of maintenance along with the cost of repairing same, to wit:

> Repairs to fix the damaged roof decking caused by
> leaking roof.                                $5586.70

> Repairs to fix all the damage done to light fixtures,
> bathroom fans, and electrical fixtures.         $5073.08

Repairs to heating and air conditioning systems and repairs
to all bathroom fixtures.                                    $2932.08

Removal of Daewoo sign.                                      $435.00

Repair of handrails by service department, bookkeeping
office, guard rails around sales lot and replace missing
heat and air unit.                                          $3328.94

These repairs were substantiated with copies of invoices that Mr Edwards had paid. When no settlement was reached in response to this letter, Mr. Edwards filed a Complaint for breach of contract against Carlock on January 19, 2005. The Complaint reads, in relevant part, as follows:

> 6. At the expiration of the term of the Lease Agreement on or about April 30, 2003, Defendants: (a) did not remove their property from the leased premises for two (2) months thereby extending the term of said Lease Agreement for said period; and (b) left the leased premises without making appropriate repairs and maintenance to the leased premises as required by the Lease Agreement.
>
> *                              *                              *
>
> 9. Plaintiff avers that once Plaintiff re-entered the leased premises after Defendants had finally vacated same, Plaintiff discovered various and [] sundry items which were in need of repair or maintenance, said repair and maintenance having been neglected by the actions or lack thereof by the Defendants.
>
> 10. The surrender of the leased premises in the afore-described condition constituted a breach by the Defendants of the covenants in sections 8.1-8.4 of the Lease Agreement and a violation of Tenn. Code Ann. § 66-28-401.
>
> 11. Plaintiff avers that in accordance with section 5.3 and sections 8.1-8.4 of the Lease Agreement and Tenn. Code Ann. § 66-28-401, Defendants had a duty to repair or maintain these items; that Defendants failed to repair or perform said maintenance; and that Plaintiff was required to employ third parties to perform such repairs and maintenance at the cost of approximately $17,355.80....

In addition to the $17,355.80 in repair costs for damages that were allegedly not caused by the tornado, Mr. Edwards also asked the court for $11,000 for an additional two (2) months of rent and $720.31 for two (2) months of real estate taxes based upon the alleged hold over by Carlock. On

April 5, 2005, Carlock filed its Answer, in which Carlock denied the material allegations of the Complaint and raised, as affirmative defenses, failure to state a claim upon which relief may be granted, accord and satisfaction, failure to mitigate, and laches.

The matter was heard by the trial court, sitting without a jury, on February 3, 2006. On March 6, 2006, the trial court entered a Judgment in favor of Mr. Edwards in the amount of $30,285.27, which amount included costs of repairing damage not caused by the tornado, twenty-five (25) days of rent for Carlock's hold over, and attorney fees incurred at the trial level. In a opinion letter of February 14, 2006, the trial court specifically found that:

> Plaintiff essentially took control of the building after the tornado and contracted for all repairs. Plaintiff recovered insurance proceeds for repairs that were determined to be "tornado damage" and has sued the Defendants for repairs and maintenance items which Plaintiff claimed were existing prior to the tornado and which Plaintiff alleges were not caused by the tornado, one way or the other. Defendants also defended on the basis that the Plaintiff was not entitled to recover on a theory of accord and satisfaction based on the receipt of insurance proceeds. The Defendant also alleges comparative fault on the part of Plaintiff for failing to act to mitigate its damages, the doctrine of laches, and waiver. The Court does not find any merit to those specifically pled defenses.

> **RULING OF THE COURT**

> \*                          \*                          \*

> 1. The Plaintiff is entitled to recover from the Defendants the sum of $5,586.70 with reference to the damaged roof, and the repair thereof.

> 2. Plaintiff shall recover from the Defendants the sum of $435.00 for expense related to removal of Defendant's sign.

> 3. Plaintiff shall recover from the Defendant the sum of $5,073.08 for electrical repairs.

> 4. Plaintiff shall recover from the Defendants for HVAC and plumbing repairs in the amount of $2,258.40...and the sum of $70.42....

> 5. Plaintiff shall recover from the Defendants the sum of $3,328.94 for the repair and replacement of the hand-rails, guard-rails, sheetrock repair and the missing HVAC unit.

6. With reference to the claim for rent for the months of May and June, 2003, including interest, the Court is persuaded that even though there were maintenance items and repairs to be made, and even if there were records and some items still left in the building, that this, in and of itself, would not have prevented the Plaintiff from renting out the building. The repairs could have been accomplished within days, had it not been for the tornado damage and the resulting loss of electricity in the area. Plaintiff took control of the building immediately upon the expiration of the lease. Plaintiff had complete and total access to the building to do the repairs for which it is charging the Defendants. The Court finds that under ordinary circumstances, the repairs could have been done in not less that 25 days after the lease expired and therefore, Plaintiff was basically deprived of his building for 25 days by actions of the Defendants in failing to maintain and repair....

Carlock appeals from the Judgment of the trial court and raises four (4) issues as stated in their brief:

1. The trial court erred in holding that the Plaintiff carried his burden of proof regarding liability of the Defendants for the alleged damages to the building in question.

2. The trial court erred in holding Defendants liable for all damages when Plaintiff did not mitigate his damages.

3. The trial court erred in holding that the Plaintiff was entitled [to] 25 days of rent following the expiration of the lease.

4. The trial court erred in holding that the Plaintiff is entitled to attorney's fees.

Mr. Edwards requests attorney fees in the amount of $6,965.00 for defending this appeal.

Because this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm absent error of law. ***See*** Tenn. R. App. P. 13(d). Furthermore, when the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses in their manner and demeanor while testifying is in a far better position than this Court to decide those issues. ***See McCaleb v. Saturn Corp.***, 910 S.W.2d 412, 415 (Tenn.1995); ***Whitaker v. Whitaker***, 957 S.W.2d 834, 837 (Tenn.Ct.App.1997). The weight, faith, and credit to be given to any witness's testimony

lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *See* id.; *see also Walton v. Young*, 950 S.W .2d 956, 959 (Tenn.1997).

It is well settled that the measure and elements of damages upon the breach of a lease is governed by the general principles which determine the measure of damages on claims arising from breaches of other kinds of contracts. The general rule of contracts, to the effect that the plaintiff may recover damages only to the extent of its injury, applies to leases. Damages for breach of a lease should, as a general rule, reflect a compensation reasonably determined to place the injured party in the same position as he would have been in had the breach not occurred and the contract been fully performed, taking into account, however, the duty to mitigate damages. In addition, damages resulting from a breach of a lease must have been within a contemplation of the parties; must have been proximately caused by the breach; and must be ascertainable with reasonable certainty without resort to speculation or conjecture. *See* <u>49 Am.Jur.2d Landlord & Tenant § 96 (2003)</u>.

Carlock first contends that the record in this case "is devoid of any competent evidence that damage existed at the building in question prior to the tornado...." Having reviewed this record, we disagree. In his testimony, Mr. Carlock, Jr. admits that Carlock should be held responsible for the missing air conditioning unit, for removal of the signs, and for damage to the railings, to wit:

> Q [to Mr. Carlock, Jr.]. Can you testify under oath today that you didn't–you didn't replace that air-conditioning unit and there was a hole in the wall?
>
> A. Oh, yes.
>
> *       *       *
>
> Q. Okay. I guess it's the same thing for the damage to the–to the railings that had been damaged and–and both cut. Were you aware that they had been cut–
>
> A. Yes, the rails had been cut. Yes, I knew that.
>
> Q. Based on your understanding of the lease, did you think you had a duty to repair and replace those before you returned the premises over to my client?
>
> A. Yes, they should have been repaired.
>
> Q. Can you agree with me that–that I guess the evidence is that you didn't do that?
>
> A. Right.

Q. Okay. And would you agree with me that you had a duty–or that you should have removed the signs?

A. Yes.

Because Carlock admits to responsibility for the missing HVAC unit, damage to the railings, and removal of signs, the only disputed damages concern damage to the roof, ceiling, and sheetrock due to leaking, damages for electrical repairs, and damages for plumbing repairs. Concerning the condition of the Building in February 2003, Sharon Fisher, who worked with Carlock in its wholesale division and operated out of the Building, testified, in relevant part, as follows:

Q. Okay. Could you describe...the condition of the building...in February of 2003.

A. Okay. There was–it was quite dirty. There was trash all over the building. Things were piled up, like phones just piled in the floor, books. There was [sic] several leaks in the building.... [W]hen you would drive up in front of the building, you could see where the wood had rotte[d].... It was just–it was in terrible shape. There was garbage that I actually had to take out.

Q. What about the bathrooms?

A. The bathrooms–the bathrooms were horrendous. The water ran all the time in the men's. We'd have to go in there a lot of times just to check on it. And the women's did, too; [the toilets] would overflow and run.

Q. Did–did you ever observe Mr. Carlock and the staff do much maintenance to the building during that period of time?

A. No.

*                         *                         *

Q. Do you recall any particular leaks that you could describe....

A. There was one in the bookkeeping office. If it rained heavy, you had to put a bucket or something down to catch the water. And there was one outside on the showroom floor that came right down where the light fixture was. It came down the wall. It would puddle up in the floor. And there was one also that was across from the fireplace

-8-

next to the showroom window where it was actually making the plaster come off the wall.  You could see the stains.

Don Neal worked as a service manager for Mr. Edwards until Mr. Edwards sold the business, then Mr. Neal worked for Carlock until the Spring of 2002.  Mr. Neal testified that there were no leaks when Mr. Edwards turned the Building over to Carlock.  Concerning Carlock's maintenance of the Building, Mr. Neal testified, in relevant part:

Q. ...What did you observe about the condition of the building during the period of time that you worked for Mr. Carlock?

A.  It–it had to be a major item before it got repaired....

*                                    *                                    *

Q. ...Did you have any plumbing problems while you were there that were not fixed?

A.  We had a plumbing problem in the lady's bathroom.  The commode had a tendency to over-flood in there in the lady's bathroom....

*                                    *                                    *

Q. Did you see any leaks from the roof down into the facility while you were there?

A.  Just the–the only one that I observed personally myself was the one in the girls' office.

Q. There's been some testimony about some possible rotted wood on the front of the building.  Are you familiar with any of that?

A. Yeah, I saw some that was up there.  It would have been probably within the last year that I was there...and I did notice some rotted wood, areas where there was no paint on the eaves of the building in the front.

Q.  And did any of that–did any of those items exist when Mr. Edwards had the building?

A.  No, sir.

Concerning the light fixtures and electrical system, Robert Boren, a master electrician with

Boren Electric who made repairs at the Building in July, 2003, testified that the light bulbs had not been maintained in some time:

> Q. Does it appear that these [light bulbs] had been replaced in a timely manner?
>
> A. No, sir, these hadn't been replaced....
>
> Q. That tells you that they've been damaged for awhile?
>
> A. Yes, sir.

In August, 2003, Jim Webb of Cantrell Services repaired the air-conditioning units, thermostats, faucets, vent fans, plug valves, and urinals in the Building. When asked the cause of the damage to these items, Mr. Webb responded "[l]ack of maintenance."

The above testimony is disputed by Rick Neely, a sales representative for Carlock, who testified that, despite a leaky roof and problems with the toilets, Carlock made every effort to repair these problems as they arose. Mr. Neely could not, however, testify as to Carlock's maintenance efforts after Carlock moved to the Vann Drive location. Kevin Slater, Mr. Carlock, Jr.'s business partner in Uniserve, also testified that Carlock made every effort to clean and maintain the Building. It is well settled, however, that the weight, faith, and credit to be given to any witness' testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *See Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn.Ct.App.1997). From our review of the entire record in this case, we conclude that the evidence supports the trial court's finding concerning Carlock's liability for damage to the Building.

Carlock next argues that Mr. Edwards failed to mitigate his damages. Under the doctrine of mitigation of damages, an injured party has a duty to exercise reasonable care and due diligence to avoid loss or minimize damages after suffering injury. *See Cook & Nichols, Inc. v. Peat, Marwick, Mitchell & Co.*, 480 S.W.2d 542, 545 (Tenn.Ct.App.1971); *Gilson v. Gillia,* 321 S.W.2d 855, 865 (Tenn.Ct.App.1958)). Generally, one who is injured by the wrongful or negligent act of another, whether by tort or breach of contract, is bound to exercise reasonable care and diligence to avoid loss or to minimize or lessen the resulting damage, and to the extent that his damages are the result of his active and unreasonable enhancement thereof, or due to his failure to exercise such care and diligence, he cannot recover. *Cook & Nichols, Inc.*, 480 S.W.2d at 545. In determining whether an injured party has fulfilled its duty to mitigate, a court must examine "whether the method which he employed to avoid consequential injury was reasonable under the circumstances existing at the time." *Action Ads, Inc. v. William B. Tanner Co., Inc.*, 592 S.W.2d 572, 575 (Tenn.Ct.App.1979) (quoting Tampa Electric Co. v. Nashville Coal Co., 214 F.Supp. 647, 652 (M.D.Tenn.1963)). Despite this duty, an injured party is not required to mitigate damages where such a duty would constitute an undue burden. *Cummins v. Brodie*, 667 S.W.2d 759, 766 (Tenn.Ct.App.1983).

In the instant case, it is uncontested that Mr. Edwards went to the Building the day after the tornado. Mr. Edwards immediately hired contractors to secure the building by boarding up damaged or missing windows and doors, and placing a tarp on the roof. Mr. Edwards also instigated repairs on the Building including damage that existed prior to the tornado. Concerning these damages, Mr. Edwards instructed those doing the repairs to differentiate tornado damage from damage existing prior to that event. Given the facts of this case, and especially in light of Mr. Edwards prompt action in not only securing the Building but also in getting the repair work started, we cannot conclude that Mr. Edwards failed to mitigate his damages.

Carlock contends that the trial court erred in awarding Mr. Edwards twenty-five (25) days rent following the expiration of the Lease. As set out above, Mr. Carlock, Jr. testified that certain Carlock property was allowed to remain in the Building following the expiration of the Lease on April 30, 2003. Furthermore, it is uncontested that Carlock continued the Building's utilities in its name until early June, 2003. The fact that Mr. Edwards put up a sign advertising the Building for lease, and the fact that Mr. Edwards stored some of his own property in the Building, has no bearing on whether Carlock was a hold over tenant under the Lease. The fact that Carlock kept property and utilities at the Building provides sufficient evidence to support the trial court's finding that Carlock held over at least twenty-five (25) days.

Finally, Carlock contends that the trial court erred in awarding Mr. Edwards' attorney fees in this case. We disagree. The Lease clearly provides for recovery of attorneys fees for breach of the agreement, to wit:

> Section 7.4. Agreement to Pay Attorneys' Fees and Expenses. In the event [that] either party should default under any of the provisions of this Lease Agreement and the other party should employ attorneys or incur other expenses for the collection of rent or the enforcement of performance or observation of any obligation or agreement herein contained, the prevailing party shall be entitled [to] the reasonable fee of such attorneys and such other reasonable expenses so incurred in the collection or enforcement of this Lease Agreement.

Having determined above that the trial court was correct in finding that Carlock had breached the Lease agreement by failing to properly maintain the Building, Section 7.4 of the Lease clearly supports an award of attorney fees in this case.

We now turn to address Mr. Edwards' request for $6,965.00 in attorney fees and expenses (as supported by the affidavit of attorney William H. Shackelford, Jr.) incurred in defending this appeal. In support of his argument, Mr. Edwards relies upon the case of *Killingsworth, et al. v. Ted Russell Ford, Inc.*, 205 S.W.3d 406 (Tenn. 2006). In granting attorney fees for the appeal, our Supreme Court relied upon the language of the TCPA, which states that "[u]pon a finding by the court that a provision of [the TCPA] has been violated, the court may award to the person bringing such action reasonable attorney's fees and costs." T.C.A. § 47-18-102(e)(1). The Court found that the award of appellate attorney fees were permissible under this provision and reasoned that "[i]f an

appeal ensues the wronged plaintiff's monetary judgment is at risk of being consumed by the resulting appellate attorney's fees unless they are also subject to be awarded. A plaintiff at trial is therefore at risk of being 'de-remedied' if unable to collect his or her reasonable appellate legal fees." ***Killingsworth***, 205 S.W.3d at 410. Mr. Edwards asks this Court to apply the same reasoning to the case at bar. Because ***Killingsworth*** involves the violation of a statute that specifically allowed for attorneys fees, we decline to extend the reasoning of that case to the one at bar, which does not involve violation of a statute but, rather, breach of contract. That being said, section 7.2 of the Lease, *see supra*, clearly provides for the recovery of attorneys fees and we see no language limiting that award to the trial level. Rather, the defense of this appeal, which was brought by Carlock, involves expenses incurred by Mr. Edwards "in the collection or enforcement of the Lease agreement." We, therefore, hold that Mr. Edwards is entitled to recover his appellate attorneys fees.

For the foregoing reasons, we affirm the Judgment of the trial court. We remand the case to the trial court for a determination of appropriate appellate attorney fees. Costs of this appeal are assessed to the Appellant, Carlock Nissan of Jackson, L.L.C., Grover Clayborn Carlock, Sr., Grover Clayborn Carlock, Jr., and their surety.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.